## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: Dividend Solar Finance, LLC, and Fifth Third Bank Sales and Lending Practices Litigation | MDL No. 24-3128 (DMM/DTS) |
| This Document Relates to 24-cv-01181: | |
| State of Minnesota, by its Attorney General Keith Ellison, | **FIRST AMENDED COMPLAINT** |
| Plaintiff, | |
| v. | |
| GoodLeap LLC, Sunlight Financial LLC, Solar Mosaic LLC, and Fifth Third Bank, N.A. dba Dividend Finance, | |
| Defendants. | |

The State of Minnesota by its Attorney General Keith Ellison ("the State"), for its Complaint against GoodLeap LLC, Sunlight Financial LLC, Solar Mosaic LLC, and Fifth Third Bank, N.A. dba Dividend Finance, alleges as follows:

1.      This is a civil enforcement action concerning deceptive lending practices by Defendants, which specialize in so-called "fintech" lending and dominate the market for consumer loans that finance purchases of residential solar-panel systems in Minnesota.

2.      Defendants are different companies and competitors but follow the same sales and profit model. Rather than engage in direct marketing, they procure relationships with businesses that sell solar-panel systems in Minnesota ("Minnesota solar companies") and use these businesses to market their loans in connection with sales. Pursuant to those arrangements, Defendants and

1

their partner Minnesota solar companies quote to consumers very low interest rates and monthly installments while promising that installments will be offset by energy savings. This emphasis on extremely low financing costs induces Minnesota consumers to both purchase systems and finance those purchases with Defendants' loans (rather than pay with cash or shop around for loans from their own banks, credit unions, or other lenders).

3.    This sales model is highly profitable but also misleading. This is because, while the quoted interest rates appear attractive, they conceal a large upfront fee charged by Defendants and secretly added to the stated price of the system and thus each loan that consumers must repay. Defendants' upfront fee (and the attendant price increase) is hidden from consumers: it is not included in sales proposals that describe the system and financing; it is not included in disclosures of finance costs that Defendants make when originating the loan; and Minnesota solar companies are not permitted to identify and explain the fee when marketing systems and offering payment options. Furthering the deception, Defendants affirmatively misrepresent to consumers that the entire price and balance of the loan pays for the cost of the system's parts and installation. Defendants also direct Minnesota solar companies to downplay the inflated price in favor of emphasizing low monthly installment payments (to be purportedly offset by electricity savings).

4.    Most customers never learn they are paying up to 36% more because they agreed to finance through Defendants rather than paying cash or obtaining a loan themselves for a cheaper cost. Only if consumers reject financing and push for "cash" sales do they sometimes learn they can pay for their system at a lower price that does not include the added fees.

5.    The impact of Defendants' practice on the market in Minnesota is significant. Defendants have collected an estimated $35 million in hidden fees from Minnesota consumers since 2017, inflating the cost of over 5,000 solar-panel systems at the expense of consumers who

may never have taken out a loan from Defendants if they would had been informed of the true cost of such financing. Defendants' practice has skewed sales towards their financing, prevented comparison shopping, and given Defendants and their partners an inflated share of the market at the expense of lenders and businesses that play by the rules. Such effects are especially troubling for an industry that needs to succeed to meet policy goals to reduce household carbon emissions. Federal and state policymakers have invested taxpayer funds to incentivize consumers to buy solar-panel systems, only to see those incentives improperly swallowed by the hidden fees that are the subject of this lawsuit.

6.     The State brings this action to restore integrity to the burgeoning residential solar-panel market and ensure compliance with state consumer-lending laws and prohibitions on deceptive practices. The State seeks remediation for violations of the Minnesota Consumer Fraud Act, Uniform Deceptive Trade Practices Act, False Statement in Advertising Act, and the Minnesota Regulated Loan Act. The State seeks an injunction ensuring truthful marketing and compliance, monetary relief for affected consumers, costs and fees incurred in the investigation and litigation, and civil penalties necessary to deter violating conduct.

## PARTIES

7.     Keith Ellison brings this action in his official capacity as Attorney General of the State of Minnesota, a constitutional officer duly authorized under Minnesota Statutes chapter 8, the Minnesota Consumer Fraud Act (Minn. Stat. § 325F.70), the Uniform Deceptive Trade Practices Act (Minn. Stat. § 325D.45), the False Statement in Advertising Act (Minn. Stat. § 325F.67), the Regulated Loan Act (Minn. Stat. ch. 56), and common law, including *parens patriae* authority, to bring this action to enforce Minnesota's laws, vindicate the state's sovereign and quasi-sovereign interests, and remediate all harm arising out of and provide full relief for violations

3

of Minnesota's laws. No other constitutional officers, agency commissioners or employees, or political subdivisions of the State of Minnesota are party to this action.

8.      Defendant GoodLeap LLC ("GoodLeap") is a California limited liability company with its principal place of business at 8781 Sierra College Boulevard, Roseville, CA 95661. The company has previously done business as Loanpal LLC. GoodLeap's registered office address in Minnesota is 1010 Dale Street North, St. Paul, MN 55117.

9.      Defendant Sunlight Financial LLC ("Sunlight Financial") is a Delaware limited liability company with its principal place of business at 101 North Tryon Street, Suite 1000, Charlotte, NC. It also maintains an office at 234 West 38th Street, New York, NY 10018 and 160 Greentree Drive, Dover, DE 19904. Its registered office address in Minnesota is 2780 Snelling Avenue N, Suite 101, in Roseville. Sunlight Financial LLC is a subsidiary of Sunlight Financial Holdings Inc., a publicly traded Delaware corporation located at 101 North Tryton Street, Charlotte, NC.

10.     Defendant Solar Mosaic LLC ("Solar Mosaic") is a Delaware limited liability company with its principal place of business 601 12th Street, Suite 325, Oakland, CA 94607. It also maintains an office at 1209 Orange Street, Wilmington, DE 19801. Its registered office address is 1010 Dale Street North in St. Paul. It is wholly owned by Mosaic Sustainable Finance Corp., which is headquartered in Oakland, CA. Solar Mosaic LLC was formerly named Solar Mosaic Inc. but merged with the entity Solar Mosaic LLC in 2021. The company operated continuously doing business as "Solar Mosaic" in Minnesota.

11.     Dividend Solar Finance LLC was a Delaware limited liability company with its principal place of business at One California Street, Suite 1500, San Franscisco, CA 94111. Dividend Solar Finance LLC also maintained offices at 3661 Valley Centre Drive, San Diego, CA

4

92130; 4001 Parmer Lane, Austin, TX 78727; 410 N. Michigan Ave., Chicago, IL 60611; 1980 Festival Plaza Drive, Las Vegas, NV 89135; and 10100 W. Charleston Blvd., Las Vegas, NV 89145. Dividend Solar Finance LLC was wholly owned by DS Global Holdings LLC, a Delaware limited liability company. DS Global Holdings was wholly owned by Dividend Solar Inc. Dividend Solar Inc. was a Delaware corporation with its principal place of business in California and is wholly owned by Dividend Finance Inc. Dividend Finance Inc. was a Delaware corporation with its principal place of business in California and was wholly owned by Fifth Third Bank, N.A. Fifth Third Bank, N.A is a national bank with its principal place of business in Ohio and wholly owned by Fifth Third Bancorp, a publicly traded corporation. Through a merger agreement dated July 31, 2023, Dividend Solar Finance LLC merged with Fifth Third Bank N.A., with Fifth Third Bank N.A. serving as the "surviving" entity and Dividend Solar Finance LLC ceasing to exist as of the merger date. By way of the merger and Delaware law, Fifth Third Bank N.A. accepted all obligations and liabilities incurred prior to the merger by Dividend Solar Finance LLC. Fifth Third Bank N.A. also continues to engage in financing consumer purchases of solar-panel systems under the trade name Dividend Finance. The surviving corporation Fifth Third Bank N.A.'s registered office address is 2345 Rice Street, #230 in Roseville.[1]

**JURISDICTION AND VENUE**

12.     This action was originally filed in Hennepin County District Court, which has jurisdiction over the subject matter of this action pursuant to Minn. Stat. § 8.01, § 8.31, § 8.32, § 325D.45, § 325F.70, § 325F.67, ch. 56, and common law. Defendants then removed the action to

---

[1] As used herein, "Dividend" refers to the actions of the prior entity Dividend Solar Finance LLC up until the merger and to Fifth Third Bank N.A. dba Dividend Finance prospectively since the merger. All liability concerning actions by Dividend Solar Finance LLC as alleged and before the merger has been assigned to Fifth Third Bank N.A by way of the merger agreement.

this Court, which denied the State's motion to remand on October 22, 2024 and held that Count V of the State's original complaint against Dividend was subject to "complete preemption" and created federal-question jurisdiction under 28 U.S.C. § 1331. Following that order, the State no longer alleges Count V against Dividend by way of this Amended Complaint and plans to move to remand after the filing of this Amended Complaint pursuant to 27 U.S.C. § 1367.

13.     This Court has personal jurisdiction over Defendants pursuant to Minn. Stat. § 543.19 because they transacted business in Minnesota and committed acts in Minnesota causing injury to the public and in violation of Minnesota law.

14.     As filed in Hennepin County District Court, venue was and upon remand would be appropriate in Hennepin County under Minn. Stat. § 542.09 because the cause of action arose, in part, in Hennepin County, and several of Defendants' office resident agents are located within Hennepin County.  If this case were to proceed in federal court, venue would be proper in the District of Minnesota pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred in and because Defendant does business in this District.

## GENERAL ALLEGATIONS

15.     While this case involves certain factual and legal nuances relating to each Defendant and its business with Minnesota solar companies and consumers, the practices that mislead consumers are largely common among each Defendant. Simply put, Defendants deceive consumers by charging a hidden and costly upfront fee that they add into the stated price of each financed system while falsely telling consumers that the inflated price only reflects the system's cost rather than financing. Most consumers that financed thus did not know that they were paying a large financing cost and could have paid much less by paying the "cash" price or shopping around for their own loan. Section I outlines Defendants' entry and growth in Minnesota's market for

6

loans that finance residential solar-panel systems and the common pattern concerning Defendants' hidden upfront fee. Sections II through V detail the sales, relationships with Minnesota solar companies, and misleading statements by each Defendant. Section VI outlines the impact that Defendants' practices have caused in Minnesota's residential-solar-system market and harm to Minnesota consumers and honest businesses.

I.    **DEFENDANTS' GROWTH IN MINNESOTA'S SOLAR LENDING MARKET AND RELIANCE ON HIDDEN UPFRONT FEES**

16.    Minnesota, like other states, has experienced a rapid increase in sales of residential solar-panel systems (called solar photovoltaic or "solar PV" systems) affixed to the roof of a purchaser's home or other structure to generate electricity and offset household utility costs. Growth in this industry is attributed to many factors, including government incentives, declining material costs, and heightened consumer demand for clean electricity.

17.    One of the most important public policies driving increased demand for residential solar-panel systems is the Residential Clean Energy Credit, which has also been called the Investment Tax Credit and is referred to herein as "the solar tax credit." The solar tax credit was passed by Congress to reduce federal tax liability for homeowners who purchase residential solar-panel systems, with a dollar-for-dollar reduction based on the price paid for a qualifying system and installation. Congress first enacted a version of the solar tax credit in 2005 of 30% for purchases up to $2,000. Congress removed the $2,000 cap in 2009. While it reduced the percentage to 26% in 2020, it extended the solar tax credit in 2022 as part of the Inflation Reduction Act, which raised the percentage back to 30% through 2032.

18.    The solar tax credit is designed to incentivize the purchase of residential solar-panel systems and can be applied towards the amount paid during a given tax year for panels, labor costs

for preparation and installation, related equipment, and certain energy-storage devices. Costs of financing cannot be counted towards the solar tax credit.[2]

19.     While sales of residential solar-panel systems have risen since the solar tax credit was established, so too has aggressive and deceptive sales tactics. Such tactics have included creating confusion about sellers' affiliation with utilities, overpromised savings, creating confusion around eligibility for the solar tax credit and other incentives, failing to complete timely installations, and overall high-pressure tactics.

20.     For example, the State previously addressed a pattern of misrepresentations and brought an enforcement action in 2021 against related Utah companies Brio Energy, Bello Solar Energy, and Avolta Power (together, "Avolta Power") for the above-described practices. Avolta Power went insolvent but agreed via consent judgment to cease operating in Minnesota, finish existing projects, and pay restitution. Other companies that partnered with Defendants have also been subject to allegations of consumer fraud and/or become insolvent, including Empire Solar, Altaray Solar, Moxie Solar, Sun Badger Solar, and Solcius.[3] Other state attorneys general have encountered similar issues and brought actions for the above sales practices.[4]

---

[2] U.S. Dep't of Energy, *Homeowner's Guide to the Federal Tax Credit for Solar Photovoltaics* (March 2022) ("Miscellaneous expenses, including interest owed on financing [and] origination fees … are not eligible expenses when calculating your tax credit."); IRS, *Residential Clean Energy Credit* ("Do not include interest paid including loan origination fees.").

[3] *See* Frank Jossi, *Minnesota Solar Installer Bankruptcies Leave Unfinished Projects, Calls for Better Oversight*, ENERGY NEWS NETWORK (Oct. 11, 2021); Jeffrey Meitrodt, *Minnesota Homeowners Out Thousands of Dollars After Second Solar Installer Fails in Two Years*, STAR TRIBUNE (Mar. 8, 2020); Karl Ebert, *Sun Badger Solar Complaints: Customers Paid Nearly $1 Million for Work That Was Never Done*, MILWAUKEE JOURNAL SENTINEL (Apr. 19, 2023); George Shillcock, *Moxie Solar of North Liberty Faces Backlacsh as Consumer Complaints Pile Up*, IOWA CITY PRESS-CITIZEN, Mar. 16, 2022; Billy Ludt, *National Solar Contractor Sunworks Files for Bankruptcy*, SOLAR POWER WORLD (Feb. 8, 2024).

[4] *See, e.g.*, Bailey Schulz, *New Jersey Solar Company Allegedly Pressured Vulnerable Populations Into Contracts for 'a Shoddy Product*," USA TODAY (Apr. 10, 2023); Clayton S.

21.     The sharp growth in sales of solar-panel systems, including by the above companies, has occurred while Defendants have become dominant in the "solar lending" market for such sales and partnered with many of those companies to finance sales—including Empire Solar, Altaray Solar, Moxie Solar, Sun Badger Solar, Powerhome Solar, and Solar Titan. Defendants GoodLeap, Sunlight Financial, and Mosaic are not depository institutions or traditional banks. Nor was Defendant Dividend a depository institution or traditional bank until its merger with Fifth Third Bank N.A. in July 2023. Defendants identify themselves as "fintech" (combining "financial" and "technology") companies that specialize in consumer lending through a software application on a smartphone or tablet.

22.     Rather than advertise directly to consumers, Defendants approach and enter relationships with Minnesota solar companies whereby sales representatives for the solar companies feature Defendants' loans as part of "sales proposals" or "custom proposals" presented to potential customers as the way to pay for their purchase. These sales proposals, presented individually to each consumer live (in person or remotely) and designed for each specific home, are integral to the sales process and heavily relied on by consumers to understand the nature of the

---

Friedman et al, *False Promises: As States Tackle Residential Solar Complaints, How Companies Can Avoid Problems*, UTILITYDRIVE (June 22, 2023); *Attorney General Brnovich Settles Lawsuit Against Solar Company*, ARIZONA ATTORNEY GENERAL'S OFFICE (Feb. 5, 2015); *Carr Warns of Misleading Solar Power Offers*, GEORGIA ATTORNEY GENERAL'S OFFICE (Aug. 18, 2022); Danika Worthington, *Solar Company Accused of Scamming 15 Colorado Consumers of $450,000*, THE DENVER POST (Jan. 14, 2017); Shannon Behnken, *Florida Attorney General's Office Takes Legal Action Against Solar Company*, WFLA (Nov. 7, 2023); *Federal Judge Grants Tennessee Attorney General's Temporary Restraining Order Against Solar Titan USA*, TENNESSEE ATTORNEY GENERAL'S OFFICE, Feb. 8, 2023; Kevin Robinson-Avila, *AG Takes Legal Action Against Solar Companies*, ALBUQUERQUE JOURNAL (Aug. 23, 2023); John Downey, *Shuttered NC Solar Business Files for Bankruptcy; Faces Scrutiny from Several States*, TRIANGLE BUSINESS JOURNAL (Oct. 10, 2022), 2022 WLNR 32372489.

system and purchase of the solar-panel system. Consumers frequently agree to purchase their system based on the presentation of the sales proposal.

23.    Defendants are the four dominant businesses in Minnesota's solar lending market and have made over $207 million in loans to finance purchases of solar-panel systems in Minnesota. They started offering solar loans after the solar tax credit became an established feature of the federal tax code and built their loans around an expectation that customers will receive and use their solar tax credit to make a large payment to their lender early in the loan's term.

24.    Defendants also each partner with solar companies to integrate their loans into sales proposals. To maintain low installment payments throughout the life of the loan, which can be 10 to 30 years, customers are expected to receive the solar tax credit and use the credit to pay a lump sum to Defendants within an initial period—usually 18 months—after installation (referred to herein as "the tax-credit payment"). If the customer does not make the tax-credit payment, the loan re-amortizes and the monthly payment sharply increases.

25.    Minnesota solar companies that have sold the most systems financed by Defendants are All Energy Solar (2,311 sales financed by Defendants), Everlight Solar (1,742 sales financed by Defendants), Avolta Power (493 sales financed by Defendants), and Sun Badger Solar (307 sales finance by Defendants), but several others have had relationships with Defendants. As stated above, Avolta Power ceased operating in Minnesota following a consent judgment with the State related to misleading practices. Sun Badger Solar ceased offering new sales and entered receivership following an investigation by the Attorney General's Office and a lawsuit filed by the City of Chicago for misleading practices.

26.    The most attractive aspect of Defendants' loans to consumers is the low annualized percentage rates (APRs) featured and emphasized in sales proposals. Defendants are experienced

in sales of residential solar-panel systems and designed their loans for Minnesota solar companies to tout low APRs and low monthly payments that ostensibly will be equal to or exceeded by savings on utility bills resulting from a purchased solar-panel system.

27.    But the low APRs touted in sales proposals hide the true cost of financing to the consumer. Indeed, Defendants' primary revenue source is a large upfront financing fee that is included as a percentage of the total price of each consumer's loan. These upfront fees are referred to in various ways internally, including "program fees," "lending fees," "finance fees," "platform fees," "original issue discounts," and "dealer fees," among other labels, but they function the same basic way for each Defendant and each loan.

28.    Defendants' upfront fees are unilaterally set by Defendants at the outset of their relationships with Minnesota solar companies, though Defendants communicate changes in the percentage amount of their fees from time to time based on borrowing costs and other business considerations. The fees vary depending on the loan but are usually between 10 percent and 30 percent of the stated total price of the system.[5]

29.    Consumers are unaware of Defendants' upfront fees because Defendants do not allow sales companies to identify such fees in sales proposals and do not calculate such fees in advertised APRs or otherwise disclose the fees as finance charges. Instead, Defendants require Minnesota solar companies to hide the fee in the stated price of the financed system. This means that the upfront fee inflates the original principal amount of the loan, even though Defendants and

---

[5] Defendants have made a small number of loans with 0% upfront fees, but such loans are rarely offered because they charge higher interest and are thus not as appealing to consumers able to compare costs between Defendants' financing and other payment methods.

their partner Minnesota solar companies tell consumers that the stated price is disbursed to the solar company to pay for hardware and installation of the solar-panel system and not financing.

30.     Defendants also instruct partner Minnesota solar companies on methods to de-emphasize the total price of financed solar-panel systems (secretly inflated by Defendants' upfront fee) in favor of the monthly installment payment on the loan and utility savings represented to offset that monthly payment.

31.     Meanwhile, nearly all Minnesota solar companies that partner with Defendants have alternatively offered and sold systems without Defendants' financing—if the customer is identified as someone who will likely not need or want Defendants' financing and is more focused on the total cost. These sales are known in the industry as "cash" sales, even though they may be financed with a loan independently arranged by the consumer. The Minnesota solar company may even refer cash consumers to lenders that are known to make home equity loans for solar-panel installations. More commonly identified alternative lenders include the nonprofit Center for Energy and the Environment ("CEE") and Affinity Plus Credit Union ("Affinity Plus").

32.     For nearly every Minnesota solar company that offers and makes cash sales in the regular course of business, Defendants' upfront fee percentage is not added on or included in the cash sale price. Thus, the cost for cash sales (including those subject to independently arranged financing) is 10% to 30% less than that for sales financed by Defendants. But unless the Minnesota solar company informs the purchaser of cheaper cash purchase options (and most do not do so or only do so in rare circumstances), customers are unaware that they could pay far less if they pay in cash or arrange their own loan.

33.     As detailed in the counts below, consumer-lending laws broadly require that lenders prominently disclose all charges payable directly or indirectly by the consumer and imposed

directly or indirectly by the creditor as an incident to or condition of the extension of credit. This is important so that customers are aware of the costs of financing and can either decline financing or shop around for better rates.

34.     Knowing that consumers are unaware of the upfront fees, Defendants rely on various rationales and artfully drafted contracts with Minnesota solar companies to create fictions and other maneuvers to justify their failure to disclose their upfront fees. These maneuvers vary but all tie back to a provision included in Defendants' contracts and providing that solar companies also mark up prices for cash sales by an amount equivalent to Defendants' upfront fee, thereby creating a similar price for cash sales (referred to herein as "Defendants' cash-pricing directive").

35.     Defendants' cash-pricing directive, however, is impractical, undermined by their interactions with Minnesota solar companies, and generally not followed. Instead, Minnesota solar companies are permitted to and do to skirt Defendants' cash-pricing directive and offer lower-priced systems to customers who reject Defendants' financing or express interest in and concern about the system's overall cost. Defendants do not have the practical ability to and do not attempt to dictate how solar companies that make regular cash sales price solar-panel systems when they are not financed by Defendants. As one installer stated and others similarly conveyed, "practically, I don't know how you would do it."

II.    DEFENDANT GOODLEAP

36.    GoodLeap is engaged in the business of making loans in Minnesota and has operated in Minnesota as a licensed lending business since 2018.[6] From 2018 through 2023, GoodLeap made at least $33,045,208.68 in loans to 853 Minnesota consumers.

### A. GoodLeap's Sales Model and Representations to Consumers

37.    GoodLeap has partnered with Minnesota solar companies Empire Solar Group LLC, located in Salt Lake City, UT (284 Goodleap-financed Minnesota sales); Blue Raven Solar, located in Orem, UT (169 Goodleap-financed Minnesota sales); Solcius LLC, located in Provo, CA (154 Goodleap-financed Minnesota sales); and Avolta Power Inc., located in Orem, UT (131 Goodleap-financed Minnesota sales). A handful of other Minnesota solar companies have a relationship with GoodLeap but have sold fewer GoodLeap-financed projects.

38.    GoodLeap dictates the terms and methods for Minnesota solar companies to market and sell its loans and provides training to Minnesota solar companies on how to market its loan products. This includes videos that direct sales company representatives on loan features to emphasize when interacting with consumers.

39.    GoodLeap managers tell Minnesota solar companies that it has "proven solar sales and operations executives" and can instruct on how to use GoodLeap's loans to maximize sales. It claims that one of its executives made over 1,000 sales and describes his passion as "kicking ass in the solar industry." GoodLeap provides materials to Minnesota solar companies that it says will allow such companies to "maximize conversions and increase sales." It claims that its loans with

---

[6] Businesses engaged in lending that are not banks or other financial institutions supervised by state and federal regulators must obtain a license from the Minnesota Department of Commerce, pursuant to chapter 56 of the Minnesota Statutes and discussed further under count IV below.

"interest rates as low as 1.49%," "fast, online approvals," and "minimal documentation" will allow solar companies to "sell more." GoodLeap training instructs Minnesota solar companies to emphasize low monthly loan payments (e.g., "Low Payment Wins") and that "solar loans get paid off quickly." GoodLeap offers prizes for salespeople that sell certain levels of GoodLeap loans.

40.    GoodLeap provides solar companies with a sample sales proposal that represents to consumers that their utility rates will sharply increase and that savings from purchased systems will "match or exceed" electricity usage. It tells salespeople to "beat up the [utility] bill" and "build the pain." It includes a slide describing GoodLeap's loan, prominently featuring a low APR and low monthly payment. It tells salespeople to emphasize that the consumer's monthly loan payment will be offset by electricity savings. It calls this a "1-2-3 Closing Technique."

41.    Accordingly, Minnesota solar companies that partner with GoodLeap include features of GoodLeap's loans as a prominent component of sales proposals presented to consumers.

42.    GoodLeap instructs Minnesota solar companies to emphasize low APRs. It offers one loan product that does not require a monthly payment until an introductory period ends and instructs that consumers can pay off the loan during the period to incur "no upfront costs" and "zero interest." A similar video instructs that the customer can pay off the loan early to "pay no interest or fees." Another video instructs that GoodLeap's "fastpay" loan allows the consumer to "maximize savings" and pay "no interest" during an introductory period before the tax-credit payment is made. The video instructs that the loan features "low interest rates" after the introductory period. Another marketing video touts what it calls a "no interest" or "zero interest" loan options.

43.     Once the consumer agrees to finance with GoodLeap based on the sales proposal, the Minnesota solar company representative is directed by GoodLeap to visit GoodLeap's portal and enter the customer's name, address, and contact information to apply for the loan. The sales representative enters the information, loan product, and loan amount—often on the salesperson's own tablet.

44.     GoodLeap emphasizes to Minnesota solar companies that its loan-approval process is "fast" and "instant."

45.     After the application is submitted and the credit check is approved, GoodLeap emails loan documents at the time of the sale. GoodLeap is responsible for representing loan terms and complying with consumer-lending laws. The consumer is directed to e-sign the documents.

46.     As part of the package emailed to consumers, GoodLeap includes a document called "Key Loan Terms" that identifies a "loan amount," "loan term," and "Interest Rate/APR," along with information about monthly installments. It also provides a "Truth in Lending Disclosure Statement" that identifies the "Annual Percentage Rate," "Finance Charge," "Amount Financed," and "Total of Payments" on the loan. GoodLeap also provides a "Loan Agreement" that identifies the loan's "interest rate/APR."

47.     Elsewhere, GoodLeap's loan documents identify a principal amount and describe it as paying for the purchased solar-panel system. For example, GoodLeap states in the Truth in Lending Disclosure Statement that the "amount financed" is "the amount of credit provided to you or on your behalf." GoodLeap purports to itemize the "amount financed" by stating that the entire amount is disbursed to the Minnesota solar company "on [the consumer's] behalf."

48.     GoodLeap's Loan Agreement also provides that the "[p]urchased [g]oods under this Loan Agreement will be detailed in your Home Improvement Agreement with your

Contractor." Elsewhere GoodLeap has consumers initial that they received the installation agreement. The loan documents reference the installation agreement and tell the consumer that the "home improvement agreement between you and the Contractor" provides for the Minnesota solar company to "install solar panels" and related hardware. Accordingly, the installation agreements further inform the borrower that the amount financed or principal of GoodLeap's loan will pay for the system's parts and installation (not financing). The documents state that the borrower will repay the loan in exchange for this "value received."

### B. GoodLeap's Hidden Finance Fee

49.     The largest cost to the consumer charged by GoodLeap as part of the loan is its upfront fee imposed at the time of origination and added to the loan's original balance. The fee, however, is not included as part of the "finance charge" or APR disclosed in loan documents or the APR identified in sales proposals and other marketing.

50.     GoodLeap's upfront fee is charged to the borrower by GoodLeap on every loan as a percentage of the loan balance, ranging between 6 and 34 percent. Though the upfront fee is part of the loan balance taken out and owed by the borrower, the amount of the fee is not disbursed to the Minnesota solar company for parts and installation. It is retained by GoodLeap but is still part of the loan balance that the consumer must repay to GoodLeap. The borrower then pays a large portion (if not all) of the fee amount early in the loan's term if the consumer makes the tax-credit payment.

51.     GoodLeap's average fee is 19.32 percent of each loan. The average amount charged to consumers and added to their loan balance is $7,552.19. GoodLeap has charged at least $6,442,014.47 in fees on Minnesota consumers between 2017 and 2023.

52.    The exact percentage of GoodLeap's fee for a given loan depends on the loan's term and annual interest rate, as selected by the Minnesota solar company that made the sale. GoodLeap offers various loan products with different durations, rates, and corresponding hidden fees. These loan options are presented to the Minnesota solar companies to choose from when creating sales proposals for consumers.

53.    Any consumer who purchases from one of GoodLeap's partner Minnesota solar companies and meets baseline qualification standards is eligible to receive a loan. Such standards include a minimum credit score and home ownership. The individualized rate and fees applicable to a given borrower are not based on individualized credit risk; the annual interest and fees for a given loan offered by GoodLeap are the same for every qualifying borrower.

54.    As described in the following paragraphs, Minnesota solar companies that partner with GoodLeap generally charge their regular cash price—i.e., their actual price without GoodLeap's upfront fee added—to customers who are identified by the Minnesota solar company as "cash" customers.

55.    Empire Solar Group is no longer in business but was GoodLeap's highest-volume Minnesota solar company (284 financed sales). Empire Solar Group would offer systems either (a) for its pre-set cash price that could be paid with financing arranged by the consumer or (b) financed by GoodLeap at a higher price that included GoodLeap's upfront fee. For example, one consumer was offered a system either for Empire's cash price of $28,700 or for financing with a GoodLeap loan for $38,818. The difference in price accounts for GoodLeap's upfront fee.

56.    Blue Raven Solar is GoodLeap's second-highest selling Minnesota solar company (169 financed sales) and offers cash sales if customers express sufficient interest in them. If the customer is identified as appropriate for financing, however, GoodLeap's fee is added to Blue

Raven's cash price so the consumer will incur a larger loan balance. This allows Blue Raven to receive the same revenue from a cash purchase as a financed purchase. In other words, according to Blue Raven Solar, GoodLeap "passe[s] through" the fee in the form of a higher sales price that Blue Raven must offer. However, not every customer is made aware of the cash option. In total, only 14 percent of Blue Raven's sales are "cash" sales and sold without GoodLeap's upfront fee.

57.     Solcius LLC filed for Chapter 7 bankruptcy in February 2024 but before that was GoodLeap's third-largest selling Minnesota solar company (154 financed sales) and similarly collected a baseline cash price for each sale, though it allowed contractors it worked with to sell systems at a higher price that allowed them to collect a commission above the cash price. When a customer was identified for financing, the contractor added GoodLeap's fee to the stated price. The price of a system sold for cash (which can include other financing arranged by the customer) was always lower because Solcius does not include GoodLeap's upfront fee.

58.     Avolta Power is no longer operating but was GoodLeap's fourth-largest selling Minnesota solar company (131 financed sales). When a customer was identified for financing, Avolta would add GoodLeap's upfront fee onto its cash price, as stated by Avolta's executive:

> [I]f Avolta's cash price for an installed and operational solar system was $30,000, Goodleap … would extend a loan of approximately $37,650-$37,950 to the consumer but retain between $7,650-7,950 of the loan proceeds as a finance charge or origination fee. The closer would present the 'price' of a financed solar system as the combined total of Avolta's cash price and the lending fee.

The Avolta executive further explained that, if customers "expressed a preference to purchase a solar system with cash," Avolta "would allow that and would not charge the higher price [with the finance fee] as a result."

59.     The other Minnesota solar companies that partnered with GoodLeap applied the fee the same way, including CR Solar (22 GoodLeap-financed sales), All Energy Solar (7 GoodLeap-

financed sales and discussed in paragraphs 101 through 105 below), and Wolf River Electric (6-GoodLeap financed sales and discussed in paragraphs 145 through 146 below).

60.     Another company, Apadana Energy LLC, followed the same practice but made just three GoodLeap-financed sales through one former sales contractor. In one example, Apadana provided the contractor with its cash price of $21,375.68 and the contractor received a "revised system price … from [GoodLeap] … adjusted to $27,757.43," which was "the sum of [Apadana's] cash price plus [GoodLeap's] fees." GoodLeap "retained the $6,381.75 in fees added to the contract price." When Apadana discovered the fees charged by GoodLeap and added to the cost of their systems by the contractor, it stopped further GoodLeap-financed sales. GoodLeap later cancelled its relationship with Apadana due to its lack of promoting GoodLeap financing. Rather than selling systems using GoodLeap's model, Apadana prefers "full disclosure" so customers can "shop around" for financing and understand how costs of financing impact the return on investment. Apadana states that it identifies financing costs associated with loans into their sales proposals and believe this is more transparent.

## C. GoodLeap's Reliance on Contractual Fictions to Evade Disclosure Requirements

61.     To get around laws requiring that all direct and indirect costs of credit be included in a calculation of the "finance charge" and "annual percentage rate" prominently disclosed to consumers, GoodLeap devised contracts with Minnesota solar companies that disguise the charge as an overhead cost incurred by the Minnesota solar company. If the substance of the transactions is considered over the contractual fictions, however, GoodLeap's fee is paid by the borrower at GoodLeap's direction as a condition of financing. GoodLeap's contract in other paragraphs makes clear that the Minnesota solar company will charge and collect a cash price (called the "Installer Price" in GoodLeap's contract with the Minnesota solar company) and that GoodLeap's upfront

fee is added to that price to constitute the original loan balance (called the "Loan Amount" and the "Amount Financed" in the contract) owed by the consumer. In reality, the fee is incurred and paid by the borrower, not the Minnesota solar company, and is imposed by GoodLeap as a condition of financing.

62.    Pursuant to the contractual fiction, GoodLeap also includes a provision in its contracts with Minnesota solar companies purporting to require that financed sales be priced "no higher" than for cash sales. But, as detailed above, this contract provision is impractical, not followed by GoodLeap's partner Minnesota solar companies, and not checked or verified by GoodLeap. Regardless of the provision, GoodLeap's sales partners in practice add the fee to the cash-sale price as a condition of financing. GoodLeap's contractual provisions represent a contrivance devised to evade loan-disclosure laws.

### D.  GoodLeap's Ineffective and Misleading Disclaimer

63.    At some point after June 8, 2021, GoodLeap added near the bottom of its "Truth in Lending Disclosure Statement" a provision stating: "Your Contractor may have opted to pay GoodLeap a fee in order for GoodLeap to offer you credit on the terms in this Agreement. Your purchase price set by the Contractor may include your Contractor's various costs, including this fee." This statement is in small print unlikely to be seen by customers, let alone understood before they agree to finance.

64.    The above statement also comes after the salesperson presented GoodLeap's low APR in the sales proposal and appears in the same document disclosing the "Finance Charge" and "APR" that does not factor in the fee as a cost of financing. In addition, the statement itself is misleading: it says the fee "may" have been paid by "Your Contractor." In reality, GoodLeap is always collecting the fee from the purchaser; the contractor never remits funds to GoodLeap

separate and apart from the sale closing. GoodLeap directs and knows that the fee is added to and included in the purchase price and loan amount, directs and knows that the fee is paid by the consumer as part of the loan amount, and directs and knows that the fee is a condition of extending credit to the consumer and not one of the "Contractor's various costs." Nor does the above statement convey the fee *amount*, which averages over $7,500 per customer and significantly increases the cost of the system above the cash price.

### E.  Prepaid GoodLeap Loans Result in Illegally High APRs

65.     After GoodLeap's loan is originated and the repayment period begins, GoodLeap trains Minnesota sales companies to encourage consumers to pay off their loan early and "bundle" their loan into a mortgage loan. GoodLeap tells solar sales companies that "the average solar loan gets paid off in less than 7 years" and that GoodLeap loans are "pa[id] off even faster." GoodLeap also pitches to borrowers that they refinance their GoodLeap loan through a mortgage program they offer. GoodLeap tells salespeople to "leverage[e] refinance at the point of sale."

66.     Accordingly, 149 Minnesota consumers through 2023 paid off their GoodLeap loan early. For 88 of these consumers, that early payoff shortened the loan's term and resulted in an adjustment of their effective APR that exceeded allowable rates under Minnesota law, requiring refunds. The average finance charge exceeding the allowable amount for these 88 consumers is $3,417.14. The overpaid finance charges were not refunded after early payoff.[7]

---

[7] Details concerning this legal obligation and failure to refund overpaid finance charges on early-payoff loans are detailed as part of count V below.

### III.   DEFENDANT SUNLIGHT FINANCIAL

67.   Sunlight Financial is engaged in the business of lending in Minnesota and has operated in Minnesota as a licensed lending business since 2021. From 2017 through 2023, Sunlight Financial made at least $75,077,388.11 in loans to 2,162 Minnesota consumers.

### A.   Sunlight Financial's Sales Model and Representations to Consumers

68.   The highest-selling Minnesota solar companies that partnered with Sunlight Financial are All Energy Solar, located in Saint Paul, MN (1,581 Minnesota sales financed via Sunlight Financial); Solcius LLC, located in Provo, CA (121 Minnesota sales financed via Sunlight Financial); Sun Badger Solar LLC, located in Waukesha, WI (110 Minnesota sales financed via Sunlight Financial); Green Solar Technologies, located in North Hollywood, CA (91 Minnesota sales financed via Sunlight Financial); and Avolta Power Inc., located in Orem, UT (74 Minnesota sales financed via Sunlight Financial). Eleven other Minnesota solar companies have had a relationship with Sunlight Financial and together sold 185 loans financed via their relationship with Sunlight Financial.

69.   Sunlight Financial started publicly selling shares in 2021 and would tell solar companies it was seeking to "accelerate [its] growth" and styled itself as "one of America's fastest growing companies." Unlike the other Defendants, Sunlight Financial uses out-of-state banks and credit unions to fund the loans it markets to Minnesota consumers.[8] As stated by Sunlight Financial to Minnesota solar companies: "We provide financing to help your customers go solar. The way we provide that financing is by working with multiple capital providers … to provide that capital

---

[8] These funders are Addition Financial Credit Union, All In Federal Credit Union, Alliant Credit Union, Corning Credit Union, Cross River Bank, Kitsap Credit Union, Spectrum Credit Union, and Technology Credit Union.

for you to sell those loans." Sunlight Financial trains Minnesota solar companies to tell consumers the financial institutions that it partners with are "providing the funds" for its loans. Sunlight Financial calls the financial institutions its "capital funders."

70.    Under contracts with its capital funders, Sunlight Financial conducts underwriting, marketing, training to partner solar companies, servicing and collection of payments, compliance and "risk management services," and disclosures and presentation of loan documents to consumers. Sunlight Financial also coordinates between capital funders and Minnesota solar companies, approves and monitors solar companies they partner with, and reviews and processes loan applications. Sunlight Financial also repurchases loans that failed underwriting standards, were taken out based on misrepresentation or omission, or were subject to repurchase by the capital funder from the loan's assignee. Sunlight Financial also retains the right to repurchase other loans.

71.    Sunlight Financial dictates the terms and methods for Minnesota solar companies to market and sell its loans. Like GoodLeap, Sunlight Financial touts that its management has significant experience in selling residential solar-panel systems and designed its loan products to maximize sales. It claims that its "streamlined online look … provides instant, at-the-kitchen table approvals, paperless underwriting and document generation, and online signing and submission procedures." It emphasizes the speed that it processes loan applications, stating they get approvals "while [the sales representative is] in the home" and has "no confirmation call to hold up the process."

72.    Under contracts with Minnesota solar companies, Sunlight Financial administers and disburses funds to pay for financed systems, provides training, and is "responsible for the compliance" of loan documents. The capital funder generally pays money into an account administered by Sunlight Financial, with Sunlight Financial acting as paying agent on a given loan

and disbursing the funds to the Minnesota solar company. Sunlight Financial will also make advances to the Minnesota solar company before installation is complete.

73.     The capital funder for each loan does not actually disburse or "fund" the full loan principal. Instead, the capital funder pays into Sunlight Financial's account a percentage of the stated loan amount (what the contracts call "par") which is the loan's principal balance (including the upfront fees added to the loan, as described in section III.B below). The percentage funded by the capital funder is dictated by attachments to Sunlight Financial's agreements with capital funders and depends on the given loan.

74.     Sunlight Financial offers training to Minnesota solar companies on how to market Sunlight Financial loans. This includes videos that instruct sales representatives about Sunlight Financial loan features. Sunlight Financial training instructs on how to sell residential solar-panel systems and tells solar companies to "include [Sunlight Financial's] financing options in" sales proposals. Sunlight Financial tells solar companies to "GO forth and sell Sunlight loans!"

75.     Sunlight Financial presentations to solar companies heavily tout low APRs "from 0.00% to 6.99%." They state that their "Low APRs drive more sales—attract and close the APR-focused customer today!" Sunlight Financial states that its loans feature the "Lowest APRs." They provide scripted statements to solar companies to emphasize low APRs and monthly payments:

## What you may learn ———— What you might say

Customer prioritizes monthly savings.

"You mentioned earlier that monthly savings is a priority. With a Sunlight 1.99% APR loan, you'll be paying less than your current utility bill on a monthly basis!"

76.    Sunlight Financial also includes video trainings that emphasize "attractive APRs" and "best pricing." One training empathizes that Sunlight Financial's .99% APR loan is "the best loan on the market right now" and that "your customer will be thrilled with that option."

77.    Like with other Defendants, Sunlight Financial also emphasizes fast approvals during sales visits with consumers. For example, it promotes that it will approve customers "at point of sale" and allow sellers to "ma[k]e deals quick + hassle free."

78.    Minnesota solar companies that partner with Sunlight Financial can offer the loans to any Minnesota consumer who meets baseline qualifications. Such qualifications include a minimum credit score and home ownership. The interest rate applicable to a given borrower is not based on the consumer's individualized credit risk; the rate for a given loan offered by Sunlight Financial and its partner Minnesota solar company is the same for every qualifying borrower.

79.    Sunlight Financial trainings on "How to Sell Sunlight" include guidance to Minnesota solar companies on Sunlight's loan structure built around the tax-credit payment.

80.    Sunlight Financial also has a "Sunlight Rewards" program that provides sales representatives that meet sales targets for Sunlight Financial loans with vacations, appliances, furniture, and vehicles. As stated in one training, "[Y]ou can get rewards points in prizes simply for … selling Sunlight."

81.    Sunlight Financial's loan is first introduced in a sales proposal created for each customer by the Minnesota solar company. Sunlight Financial offers software and templates for creating sales proposals. Generally, the sales proposal presented by the Minnesota solar company includes slides identifying payment for the system via a Sunlight Financial loan and emphasizes a low interest rate and low monthly payments that will be offset by utility savings.

82.     If the consumer agrees to purchase the system and finance with Sunlight Financial, they sign a purchase agreement with the Minnesota solar company. The sales representative will also input the customer's information into Sunlight Financial's portal. Sunlight Financial will preliminarily check qualifications for the loan and, if qualifications are met, email loan documents to the consumer. The consumer then executes loan documents with the sales representative either on the representative's tablet or on the consumer's own device. As part of this process and pursuant to agreements with the Minnesota solar company and capital funder, Sunlight Financial is responsible for representing loan terms and complying with consumer-lending laws (subject to review by capital funders).

83.     When the customer electronically signs loan documents, Sunlight Financial sends another email that identifies "key details and terms of your solar financing." The email identifies an "APR" that is based entirely on the interest rate applied during the term of the loan and which does not include the upfront fee described in section III.B below.

84.     The emailed loan documents also include a "Truth in Lending Act (TILA) Disclosure" that prominently identifies a "Finance Charge," which is defined to consumers in the document as "the dollar amount the credit will cost you." Sunlight Financial calculates this finance charge by totaling the interest charged during the term of the loan—without including its upfront fee. They also disclose an "APR," which it defines to consumers as "the cost of your credit as a yearly rate" and also excludes its upfront fee.

85.     The emailed loan documents also identify an "Amount Financed," which it defines to consumers as "the amount of credit provided to you or on your behalf." This amount is based on the price of the system identified by the solar company, including the upfront fee even though it is a financing cost and not paid for the solar-panel system. Sunlight Financial then further

27

itemizes the "amount financed" by describing it as the "amount financed/Gross Amount **Due to Contractor for System**" (emphasis added):

| ITEMIZATION OF AMOUNT FINANCED |
| --- |
| Amount Financed/Gross Amount Due to Contractor for System.......... $40,284.00 |

86.    The Minnesota solar company's installation agreement with the customer similarly informs the Sunlight Financial borrower that the stated price and principal of the loan is paid to the solar company for parts and installation (not financing). The installation agreement is referenced in Sunlight Financial's loan documents, where Sunlight Financial states that its approval or funding of the loan is subject to its "review and approval" of the installation agreement.

87.    The loan documents and email from Sunlight Financial identify no other fees associated with taking out the loan, including the upfront fee described in section III.B below.

88.    The emailed loan documents also include a formal "Loan Agreement and Promissory Note" that includes the APR, finance charge, and amount finance, calculated as described above, along with an "itemization of amount financed" that describes that amount financed as entirely the "gross amount **due to contractor for [the] solar system**" (emphasis added).

### B. Sunlight's Hidden Finance Fee

89.    The largest cost to the consumer charged by Sunlight Financial as part of the loan is its upfront fee imposed at the time of origination and added to the principal balance. Sunlight Financial's fee is sometimes labeled internally as its "OID" or "Original Issue Discount." Sunlight Financial's fee operates the same as GoodLeap's fee. The fee is not calculated as part of the "finance charge" or APR disclosed to consumers as the cost of financing in loan documents or the APR identified in sales proposals and other communications to consumers.

90.     Sunlight Financial's upfront fee is charged by Sunlight Financial as a matter of course on every loan as a percentage of the loan balance, ranging between 2.5 and 55 percent and added to the balance when the loan is originated (however 22 out of 2,162 Sunlight Financial loans to Minnesota consumers featured 0% fees).

91.     The fee portion is incurred by the consumer by being added to the financed cost of the system and thus the consumer's loan balance, though it is not disbursed to the Minnesota solar company for parts and installation. It is instead withheld by Sunlight Financial from its disbursement to the solar company. The fee is then owed and paid back by the consumer, however a large portion (if not all) of the fee is paid early if the consumer makes the tax-credit payment.

92.     Sunlight Financial's average upfront fee is 21.4 percent of each Minnesota consumer's loan amount. The average amount charged to Minnesota consumers and added to their balance is $6,285.79. Sunlight Financial has charged a total of at least $13,589,869.31 in upfront fees to Minnesota consumers between 2017 and 2023.

93.     The exact percentage of the fee for a given loan depends on the loan's term and annual interest rate, as selected by the Minnesota solar company that made the sale. Sunlight Financial offers loan products with different durations and interest rates (which are disclosed and known by the consumer) and corresponding fees (which are not). These loan options are presented to Minnesota solar companies to choose from when marketing Sunlight Financial's loans to finance their sales.

94.     Sunlight Financial's contracts with capital funders recognize the upfront fee retained by Sunlight Financial and states that this upfront fee is for "services" related to the loan. The contract with capital funders states that "not all Loan proceeds funded by [the capital funder] are paid to the [solar company], but rather Sunlight is paid a fee for providing the Services equal

to…the Provider Loan Price … minus the amount required to be paid to the [solar company] for such Loan."

95.     Because Sunlight Financial's loan options are available to any Minnesota consumer who purchases from one of its partner Minnesota solar companies and meets baseline qualifications, the individualized interest rate and fees applicable to a given borrower are not based on the consumer's individualized credit risk.

96.     Sunlight Financial further confirms in their training with Minnesota solar companies that the upfront fee is added to and included in the financed sale price charged by the Minnesota solar company. As stated in one training, "When you guys are quoting your customer, you are already building in the dealer fee that goes through your company. So when you're quoting your customer on these payments, when you're putting that loan amount, you're assuming the … dealer fee."

97.     Sunlight Financial's upfront fee is nowhere identified in marketing materials or loan documents and is not included in the calculation of the "finance charge" or "annual percentage rate" disclosed to borrowers.

98.     The increase in the financed sales price caused by Sunlight Financial's upfront fee is often overlooked by consumer because the total price is not a prominent feature of the sales proposal, while the low stated APR and monthly payment are emphasized and attractive to consumers.

99.     As stated above, Sunlight Financial's borrowers are told by Sunlight Financial and the Minnesota solar company that the total financed sales price is for parts and installation, not financing. But the fee portion of the financed sales price is not paid for parts and installation; rather it is owed by the borrower to Sunlight Financial as a condition of obtaining financing.

100.    As detailed in the following paragraphs, consumers who express sufficient interest in cash deals from Sunlight Financial's partners generally pay a price that is lower because it does not include the upfront fee imposed by Sunlight Financial. But the Minnesota solar companies that Sunlight Financial partners with generally only offer the lower cash price option if customers are identified by the Minnesota solar company as potential cash customers.

101.    All Energy Solar has been Sunlight Financial's highest-volume sales partner (1,581 financed sales) in Minnesota since 2017. For customers of All Energy Solar that take out Sunlight Financial loans, they are not informed about Sunlight Financial's upfront fee or that they are paying a higher price because they are financing with Sunlight Financial.

102.    All Energy Solar has a standard cash price based on the size and other aspects of the system sold. The vast majority (72%) of All Energy Solar's sales are not financed through Sunlight Financial (or other Defendants) and are paid for at this regular cash price, without an upcharge related to Sunlight Financial's fee. These cash customers likely never receive an option to purchase with a loan from Sunlight Financial at the higher price. However, when customers are identified as inappropriate for cash sales in early discussions, All Energy Solar presents them with a proposal financed by Sunlight Financial and adds the upfront fee to the cash price. This allows All Energy Solar to charge and obtain its same cash price on all sales—whether cash or financed.

103.    All Energy Solar believes it is not allowed by Sunlight Financial to identify the upfront fee to Sunlight Financial borrowers. Thus, customers who receive a Sunlight Financial proposal never know they could have purchased for a lower cash price. In few cases, All Energy Solar's customers may ask for both a cash option and financed option through Sunlight Financial. In those rare instances, All Energy Solar understands Defendants' contracts to mean that it cannot quote an alternative lower cash price for a system with all the same exact terms and features.  To

31

bypass this believed restriction and offer a lower cash price, All Energy Solar slightly tweaks the system's warranty (from 10 to 5 years) when offering a cash price to consumers so that there is a technical difference between its cash-price and financed-price proposals for the same system. In such instances, however, the higher financed price is in fact because of Sunlight Financial's upfront fee and not a different warranty period.[9]

104.    Sunlight Financial was and is aware of All Energy Solar's pricing practices and approved them as in compliance with their contract.

105.    In some cases, All Energy Solar's salespeople did not adhere to the fiction concerning price comparisons of technically different systems and instead presented alternative cash and financed proposals for systems with the same warranty length. Sunlight Financial has never audited or reviewed All Energy Solar's cash sales that do not include an equivalent markup for cash sales.

106.    Now bankrupt Solcius LLC has been Sunlight Financial's second-largest seller (121 completed financed sales) in Minnesota and signed consumers up for Sunlight Financial loans since 2020. Solcius charged and collected a baseline price for each sale, though it allowed contractors that it works with to sell its systems at a higher price that allowed them to collect an additional commission above Solicus's baseline cash price and Sunlight Financial's upfront fee. When a customer indicated interest in financing their purchase, Solcius created a sales proposal featuring a Sunlight Financial loan. In such cases, Solcius's sales contractor added and included Sunlight Financial's upfront fee onto Solcius's cash price and commission amount to arrive at the total price presented to the consumer. Meanwhile, the price of a system proposed and sold by

---

[9] All Energy Solar's contract with Sunlight Financial in fact requires a 10-year warranty for financed systems at no extra cost.

Solcius for cash was lower than with financing because Solcius did not add and include Sunlight Financial's upfront fee in its price.

107.    Sun Badger Solar is no longer in business but was Sunlight Financial's third-largest seller (110 completed sales) in Minnesota. Following consumer-fraud investigations by the Minnesota and Wisconsin Attorneys General and a consumer-fraud lawsuit by the City of Chicago, Sun Badger Solar entered receivership in a Wisconsin state court in 2023.

108.    While it was in business, Sun Badger Solar added Sunlight Financial's upfront fee (which increased the price by 10%) onto its cash price of systems purchased with its financing. Many customers who financed with Sun Badger Solar never learned there was a "cash" option without the added upfront fee. As stated in a 2020 internal sales meeting, Sun Badger instructed sales representatives to present financing by Sunlight Financial at the 10% higher price but directed them to give the lower-priced "cash" option if the customer gave indications they could arrange for payment in cash:

> Sunlight [Financial] financing will be the initial offer to our customers. If they want to proceed in a cash manner we can offer a 10% discount. Make sure that the only financing option being offered is Sunlight [Financial]. The dealer fee is going to be 10% with all financing packages offered.

109.    Sun Badger Solar's policies further confirmed that "[f]inance deals have an additional 10% above the cash price to accommodate [Sunlight Financial's] dealer fees."

110.    During one training by Sun Badger Solar, its management noted that financed customers "are paying dealer fees of course" and that cash customers "don't have to take the dealer fees in the ass," but Sun Badger Solar's management stated that representatives should only discuss cash prices if customers "speak up" and "take control of the conversation" to push for a cash sale.

111.    As an example, one consumer—BG of Bloomington—was signed up for Sunlight Financial's purported 0.99% interest loan by Sun Badger Solar, with a balance of $28,535.00 that included the upfront fee. After BG asked Sun Badger Solar about alternatives for funding his purchase, however, Sun Badger Solar presented the lower-priced cash option and was told this was their "cash discount." Under that scenario, BG was told that the "cash price for the solar portion of your system would be $19,762" and that "this saves you little more than $5K over the cost of the solar portion of your system." Another consumer—AL of Chaska –was quoted a price of $27,445 that would be financed by Sunlight Financial but later asked about purchasing for cash and was told that "the cash/self-finance price of the system is $21,609."

112.    In total, around 32 precent of Sun Badger Solar's sales were "cash" and sold without Sunlight Financial's upfront fee added on to the price. Overall, financed sales of Sun Badger Solar systems featured an average price increase of more than $10,000 because of the addition of upfront fees in the loan's principal balance.

113.    Later in Sun Badger Solar and Sunlight Financial's relationship, Sun Badger Solar rejected Sunlight Financial's instruction to not disclose the price difference or talk about the fee during initial sales pitches. In one message between Sun Badger Solar's VP of sales to a sales representative, the representative noted that Sun Badger Solar was "asked [by Sunlight Financial] not to compare cash and financed costs" and requested if he could disobey the directive and start presenting cash and financing "side by side" so that consumers could compare costs. The VP responded: "Haha yes for sure. **We aren't 'supposed' to talk about dealer fees directly**. I don't care if you do to be honest. At this point we are trying to exit our partnership [with Sunlight Financial] anyway" (emphasis added). The VP of sales said that, for customers that indicate interest in cash purchases, upfront disclosure of the cost difference between the two prices "will

34

be motivation enough to change [the consumer's] mind [to make the purchase] if they have the funds."

114.  Avolta Power was Sunlight Financial fifth-largest selling company (74 financed sales) in Minnesota. As discussed in paragraph 58 above with regard to GoodLeap, Avolta added the upfront fee onto its regular cash price for financed customers and its practice was the same when offering loans through Sunlight Financial.

115.  The other 11 Minnesota solar companies that partnered for Sunlight Financial together sold less than 200 Sunlight Financial-financed systems. But information collected in the State's investigation confirms that these other sales partners nearly all applied Sunlight Financial's fee the same way, including Empire Solar (28 Sunlight Financial-financed sales) as discussed in paragraph 55 above, Cedar Creek Energy (20-Sunlight Financial financed sales) as discussed in paragraph 116 below, and Blue Raven Solar (2 Sunlight-Financial financed sales) as discussed in paragraph 56 above. Only one company that regularly sold solar-panel systems to cash-paying customers appears to have charged cash customers an equal upcharge, and that company only had 27 financed sales and no longer does business with Sunlight Financial.

116.  One of Sunlight Financial's partner Minnesota solar companies, Cedar Creek Energy, states that it deviates from Sunlight Financial's instructions and tries to be transparent about each option to pay for systems, including fees added to Sunlight Financial sales but not cash sales. However, since Sunlight Financial discloses loan terms, the loan documents do not identify or explain such fees, falsely state that the principal goes towards paying for parts and installation, and do not include the fee in the disclosed "finance charge" or "annual percentage rate."

117.  Real Solar SBC is another Minnesota solar company with a former relationship with Sunlight Financial before it was purchased by another company that viewed the fees as bad

for consumers and refused to offer Sunlight Financial loans. Real Solar SBC completed three sales financed by Sunlight Financial from 2021 to 2022 before the company's assets were purchased by the owner of Wolf Track Energy, which sells and installs systems in Northern Minnesota and is jointly operated with a new entity Real Solar LLC. Like with other Minnesota solar companies, Sunlight Financial collected its upfront fee by having Real Solar SBC add the fee to its cash price for sales it financed. For example, one consumer—BP of Pine River—purchased a $27,000 system and was charged an $8,000 fee added to the price and resulting in a total price and loan amount of $35,000. Real Solar LLC's owner states that it was his understanding that, under its relationship with Sunlight Financial, the company "would not be allowed to tell consumers about the lending fee when [it] quoted the price of the financed system."

118.    The new owner of Real Solar LLC declined to continue selling systems financed by Sunlight Financial (or the other Defendants). He believes that Sunlight Financial's upfront fee unfairly increases the cost of systems for consumers that finance:

> I view solar panels as an investment for my customers, whereby they can pay for their purchase through reduced energy and utility costs over time. However, to make this investment worthwhile, the overall cost of the purchase needs to be as low as possible. That is my goal in pricing and selling solar panel systems. Because of this concern, I have not been interested in the sales model pushed by [Defendants], which would require me to increase the overall cost of the system and thus make it more difficult for the customer to pay off the costs of their investment.

Real Solar LLC's new owner further states that, if a customer cannot afford to pay for a system up front, he will "encourage them to seek out a loan from a reputable bank or credit union that does not require a large lender fee to be added on to the price of the system."

119.    Centauri Systems is another Minnesota solar company with a prior relationship with Sunlight Financial. The manager of Centauri Systems confirmed that systems financed through Sunlight Financial would feature lower interest rates but require a higher price with the

added upfront fee. The loan proceeds would then be paid directly to Centauri but minus the fee. If the customer expressed they could pay in cash or get a loan from a traditional bank, the customer would be presented with and charged Centauri's regular price without the fee added. Centauri System's manager stated that, because cash deals do not include the upfront fee and because financing from traditional lenders are better deals, he encourages customers to do cash sales and refers them to legitimate lenders to pay cash prices. However, he stated that the Defendant Lenders tell solar companies not to quote alternative proposals showing price differences between cash and financing. Centauri Systems tries to figure out the payment model before it gives a price and makes a proposal to the customer. Centauri tries to avoid offering alternative cash and financed proposals that show the different prices because it believes that it is not allowed to do so by Sunlight Financial or the other Defendants.

### C. Sunlight Financial's Reliance on Contractual Fictions to Evade Disclosure Requirements

120.    Because federal and state laws require that lenders include all costs imposed as an incident of credit be included in the calculation of the "finance charge" and "annual percentage rate" prominently disclosed to consumers, Sunlight Financial devised contracts that purport to describe its fee as an overhead cost paid by Minnesota solar companies rather than consumers. But Sunlight Financial's fee by its nature is paid by the borrower, at Sunlight Financial's direction, as a condition of financing. Sunlight Financial's contract with Minnesota solar companies makes clear that the Minnesota solar company will charge and collect its cash price (called the "Funding Amount" in the contract) and that Sunlight Financial's fee is added to that price to constitute the original loan balance (called the "Loan Amount" or the "System Purchase Price" in the contract) owed by the consumer. The fee is incurred and paid by the borrower, not the Minnesota solar company, as a condition of financing.

37

121.    Pursuant to this fiction, Sunlight Financial also includes provisions in its contracts purporting to ban Minnesota solar sales companies from selling systems for cash at prices that do not include the upcharge for Sunlight Financial's fee. But, as detailed above, this contract provision is impractical, not followed by Minnesota solar companies, and not checked or verified by Sunlight Financial. Regardless of the provision, nearly all of Sunlight Financial's sales partners add the fee to the cash-sale price as a condition of financing. The fee is incurred and paid by the borrower, not the Minnesota solar company.

122.    Sunlight Financial further undermines the contractual provision by instructing that the cash price only needs to be "quoted" at the same inflated price before it is "negotiated" down to the Minnesota solar company's regular cash price after the initial quote, as stated in a training video to Minnesota solar companies:

> If we're showing a lower price for the cash versus the loan, we're effectively passing on—the way it's perceived by the customer is that we're passing on the dealer fee to them. And we're not showing them that they're paying that interest charge. That wouldn't be showing them truth-in-lending form. So please avoid that sort of practice. **Obviously we understand there are negotiations that go on after the first quote, but again, cash and loan deals should be** *quoted* **at the same price.** (Emphases added.)

Consistent with Sun Badger's understanding, Sunlight Financial's presentation emphasizes that customers cannot be "quote[d]" differently for cash and financed deals.

123.    Also undermining the fiction and as detailed above as to its largest-volume seller All Energy Solar, Sunlight Financial approved the practice of proposing systems at lower cash prices as the solar company's default option, offering Sunlight Financial loans with the finance fee upcharge only to certain customers, and offering alternative and differently priced proposals for cash and Sunlight Financial products based on the false premise that a different warranty justifies the higher price that includes Sunlight Financial's fee.

124.     Sunlight Financial also states that its fees are paid "for use of Sunlight's platform and related processing services." Sunlight Financial's partner solar sales companies were generally unaware that the upfront fee pays for those services. Rather, they generally view the fee as a cost borne by the consumer as a condition of receiving credit in addition to annual interest charged over the life of the loan. All Energy Solar, for example, didn't know the reason for the fees, but believed it was "to cover" the "cost of lending" and that "they [consumers] are buying down the loan APR" by paying upfront lender fees. The option of 0%-fee loans with higher APRs further undermines the notion that the fee is for services.

125.     Sunlight Financial also sometimes calls its upfront fee an "original issue discount" rather than a services fee. All Energy Solar did not know why Sunlight Financial calls its fee an "original issue discount." Everlight Solar also testified that the term "doesn't make sense." Wolf River Energy couldn't identify any discount received by a party in the transaction. Blue Raven Solar believed that the fee was called a "discount" because Sunlight Financial "received a discount on the total value of the loan." But Sunlight Financial is not purchasing the loan; it is facilitating the origination of a loan for a purchase price that the consumer is told will pay for the system. The notion of the fee being any form of a "discount" to the consumer, the solar company, or the Defendant Lenders is nonsensical.

**D. Sunlight Financial's False Statements About Obligations to Repay**

126.     Many sales financed by Sunlight Financial have been subject to claims of misrepresentation and overpromised installation timelines. Several of Sunlight Financial's partners have faced patterns of such issues and become insolvent, ceased operating, or filed for bankruptcy—including Avolta, Sun Badger Solar, Moxie Solar, and Empire Solar.

127.     Under a federal administrative law promulgated by the FTC called the "Holder in Due Course" or "Holder" Rule, consumers can assert defenses to repayment on their loan or assert a claim for past payments made to a creditor with a qualifying relationship to the seller that made the misrepresentation or failed performance. Sunlight Financial has such a relationship with Minnesota solar companies and was required to and did insert "Holder Rule" language in its loan documents. *See* 16 C.F.R. Part 433. Minnesota consumers thus have a defense to repayment of their Sunlight Financial loans based on nonperformance, misrepresentation, or false promises made by the solar company that sold the system financed by Sunlight Financial.

128.     But while Sunlight Financial includes the Holder Rule language in loan agreements, it gives contradictory and misleading statements to Minnesota consumers about their obligation to repay loans and their defenses to repayment. Namely, it expressly states in loan agreements that a consumer's "obligation to repay this loan is independent of system performance." It also conducts follow-up calls with consumers after they sign loan documents stating that the consumer's "obligation to pay these loans are independent of system performance and any commitments made between <<installerName>> and you."

129.     These above statements are false and undermine the message and policy of the Holder Rule. They misled and confused consumers about their rights and obligations to repay loans when their systems were not installed and operational or were subjected to other misrepresentations by Minnesota solar companies that partnered with Sunlight Financial.

## IV. DEFENDANT SOLAR MOSAIC

130.     Solar Mosaic is engaged in the business of making loans in Minnesota and has been licensed as a lending business since March 2023. From 2019 through 2023, Solar Mosaic made at least $85,477,542.01 in loans to 2,147 Minnesota consumers.

## A. Solar Mosaic's Sales Model and Representations to Consumers

131.    Minnesota solar companies that partnered with Solar Mosaic include Everlight Solar (1674 Solar Mosaic-financed sales), Wolf River Electric (144 Solar Mosaic-financed sales), Altaray Solar (213 Solar Mosaic-financed sales), Avolta (31 financed sales), Cedar Creek Energy (26 Solar Mosaic-financed sales), and Solcius (26 Solar Mosaic-financed sales). Six other Minnesota solar companies have a relationship with Solar Mosaic with a combined 54 sales financed by Solar Mosaic.

132.    Solar Mosaic dictates the terms and methods for Minnesota solar companies to market and sell its loans. Under its agreements with Minnesota solar companies, Solar Mosaic agrees to provide Minnesota solar companies with training on its loan programs, instruction materials, and "ongoing support" concerning marketing and other aspects of Solar Mosaic's loan programs. Minnesota solar companies agree to "vigorously promote" Solar Mosaic's loan products to consumers and are delegated responsibility to "sell[] the Solar Systems and promot[e] and facilitate[e] access to" Mosaic's loan products. Solar Mosaic agrees to "collaborate on the marketing and branding" of loans to consumers. Solar Mosaic provides onboarding sales training and ongoing trainings to partner Minnesota solar companies.

133.    Solar Mosaic's contract with Minnesota solar companies provides for Solar Mosaic's branding and loan products to be prominently featured in sales proposals used by the Minnesota solar company. Accordingly, Minnesota solar companies that partner with Solar Mosaic include features of Solar Mosaic's loans as a prominent component of their sales proposals. These sales proposals heavily tout low annual interest that Solar Mosaic identifies to the Minnesota solar companies for different loan products.

134.    Once the consumer agrees to finance with Solar Mosaic based on the sales proposal, the Minnesota solar company's representative will work with the consumer to visit Solar Mosaic's portal and enter their name and information to apply for the loan. The sales representative enters the information, loan product, and loan amount—often on the salesperson's tablet.

135.    Solar Mosaic emphasizes to Minnesota solar companies that its approval process is fast and can be completed in a single sales visit. Once the application is submitted and the credit check is approved, Solar Mosaic emails loan documents and disclosures at the time of the sale. Solar Mosaic is responsible for representing loan terms and complying with consumer-lending laws under their partnership with Minnesota solar companies. The consumer is then directed by Solar Mosaic and the salesperson to e-sign documents—often on the salesperson's tablet.

136.    Solar Mosaic provides to consumers a set of "Home Solar Loan Documents" that purport to detail their financing purchase. One document that consumers receive is a document titled "Federal Truth in Lending Act ("TILA") Disclosure" and which repeats the annual percentage rate represented during the sales proposal and defines it as "the cost of your credit as a yearly rate"; a "finance charge" defined as "the dollar amount the credit will cost you"; and an "amount financed" defined as "the amount of credit provided to you or on your behalf." The APR and finance charge listed in the agreement do not include the upfront fee described in section IV.B below in the calculation. The document also identifies an "itemization of amount financed" that states that the entire "amount financed" is "due to" the solar company.

137.    Solar Mosaic also provides the customer with a "Loan Agreement" that prominently identifies the "Loan Amount" (it later calls the same amount the "Amount Financed") and the low "Annual Percentage Rate" based on interest alone, without including the upfront fee.

138.    The second page of the Loan Agreement further identifies a "disbursement" schedule that claims that the entire loan will be "disburse[d]" "to Your Installation Contractor." The document goes on to state that Solar Mosaic will "make the Loan to You by disbursing to the Installation Contractor" the amount of the loan. It later says "We will disburse the loan proceeds on Your behalf to" the solar company. Solar Mosaic's contracts with Minnesota solar companies also provide that the solar company's installation agreement will be used to inform consumers about their purchase and provides for Solar Mosaic's review of the installation agreement.

### B.  Solar Mosaic's Hidden Finance Fee

139.    Like with GoodLeap and Sunlight Financial, the largest cost to the consumer charged by Solar Mosaic as a condition of taking out the loan is the large upfront fee that it imposes at origination and adds to the balance of the loan. The fee is nowhere identified in marketing materials or sales proposals, and it is not included in the "finance charge" or calculated annual percentage rate disclosed as the cost of financing in the proposal or loan documents.

140.    This upfront fee is charged by Solar Mosaic on every loan as a percentage of the loan balance, ranging between 9 and 54 percent and added to the balance when the loan is originated (though a small portion of loans—39 out of 2168—have 0 percent fees). While it is part of the principal loan balance owed by the consumer, the upfront fee is not disbursed to Minnesota solar companies for parts and installation. It is instead withheld from the disbursement and retained by Solar Mosaic as a financing cost. The fee is made part of the loan balance that the consumer must repay over time, though a large portion (if not all) of the fee amount is paid by the consumer early if the consumer makes the tax-credit payment.

141.    Solar Mosaic's average upfront fee is 17.6 percent of each consumer's loan amount. The average amount charged to consumers and added to their loan balance is $5,842.59. Solar

43

Mosaic has charged a total of at least $12,666,727.44 in upfront fees to Minnesota consumers between 2017 and 2023.

142.    The exact percentage of Solar Mosaic's fee for a given loan depends on the loan's term and annual interest rate, as selected by the Minnesota solar company that has made the sale. Solar Mosaic offers various loan products with different durations, rates, and corresponding fees. These loan options are presented to Minnesota solar companies to choose from when marketing Solar Mosaic's loans and including a selected loan in the sales proposal.

143.    Solar Mosaic's loan options are available to any Minnesota consumer who purchases from one of its partner Minnesota solar companies and meets baseline qualifications, such as a minimum credit score and home ownership. The individualized interest rate and program fees applicable to a given borrower are not based on individualized credit risk; the annual interest rate and fees for a given loan product offered by Solar Mosaic and its partner Minnesota solar company are the same for every qualifying borrower.

144.    Solar Mosaic's upfront fee is added to and included in the price that would otherwise be charged by Minnesota solar companies. Accordingly, most Minnesota consumers that purchase systems from Minnesota solar companies that partner with Solar Mosaic may alternatively purchase systems for cash. For partner solar companies that offer and make "cash" sales in the ordinary course of business, they generally charge customers their regular cash price— i.e., their price without Solar Mosaic's upfront fee added. In other words, Solar Mosaic's upfront fee is only charged as a condition of financing and is not paid by cash customers.

145.    For example, Wolf River Electric began marketing Solar Mosaic financing since 2019 and has been one of Solar Mosaic's largest-volume sellers (144 financed sales). For any financed sale, Wolf River Electric takes its "base" cash price and adds Solar Mosaic's upfront fee

plus any additional amount a sales contractor may collect for its commission. Wolf River Electric collects its same base price whether the sale is for cash (at that cash price) or financed (at the higher price that includes Solar Mosaic's upfront fee).

146.    For customers that express sufficient interest in paying cash, Wolf River Electric encourages them to pay for their system up front with their own assets or by taking out a loan from CEE or Affinity Plus Credit Union. Wolf River Electric states that those customers may prefer those options because they receive a lower price—because the price does not include Solar Mosaic's upfront fee (or any equivalent upcharge). However, Wolf River Electric will provide alternative proposals for cash and Solar Mosaic financing in cases where the customer expresses interest in both options. When that occurs, the cash proposal will identify the lower price and the financed proposal will include loan details and the higher price. Around 15% of Wolf River Electric's sales are cash deals and do not include the upfront fee imposed by Solar Mosaic. Those cash systems are overall priced approximately 25% less than Solar Mosaic financed systems, though the type of loan and attendant fee percentage can vary and cause price differentials.

147.    Everlight Solar began marketing Solar Mosaic financing since 2020 and has been its largest-volume seller (1,674 financed sales). Unlike other Minnesota solar companies, Everlight Solar sells nearly 99% of its systems as financed by Defendants and so does not sell cash systems in the regular course of business in Minnesota. This is because Everlight Solar's leads are nearly all derived from door-to-door canvassing where it heavily emphasizes systems as having a "net zero" monthly cost, whereby electricity savings are promised to offset loan installment payments. Everlight Solar emphasizes that its systems thus have "no upfront cost." Like other Minnesota solar companies and pursuant to Solar Mosaic's directives, Everlight Solar adds and includes Solar Mosaic's upfront fee to the price of each financed system to be paid by the borrower.

45

148.    Avolta Power is another Minnesota solar company that sold Solar Mosaic financing (31 financed sales). Its sales practices as to Defendants' upfront fees are described in paragraph 58 above as to GoodLeap and are the same for Solar Mosaic.

149.    Cedar Creek Energy is another Minnesota solar company that sold Solar Mosaic financing (26 financed sales). Its sales practices as to Defendants' upfront fees are described in paragraph 116 above as to Sunlight Financial and are the same for Solar Mosaic.

150.    Solcius is another solar company that sold Solar Mosaic financing (26 financed sales). Its sales practices as to Defendants; upfront fees are described in paragraph 57 above as to GoodLeap and are the same for Solar Mosaic. Solar Mosaic was the first lender to start offering loans with Solcius in 2015 and stopped its relationship in February 2023. Solar Mosaic terminated the relationship in part because Solcius did not have a high enough sales volume.

151.    Greenway Solar is another Minnesota solar company that has worked with Solar Mosaic, however only one sale by Greenway Solar was financed by Solar Mosaic. The sale was outside Greenway Solar's typical sales model and arranged by the consumer directly. Greenway Solar understood that it sold the system for $211,166.20, with the customer making a down payment of around $90,000 in cash to Greenway and using a Solar Mosaic loan to finance the remainder. Solar Mosaic disbursed $106,785 to Greenway Solar related to this purchase, but records showed that the loan for this sale was actually $135,000, inflated by a $28,215 upfront fee added to the loan and charged to the consumer but kept by Solar Mosaic. With Solar Mosaic's upfront fee, the total price for the customer was actually $240,166.  Solar Mosaic thus added its $28,215 fee to the loan amount even though it was Greenway Solar's understanding that there would be no upfront fee because it had no agreement to add such fees. As discussed further in paragraph 213 below, Greenway Solar has declined to enter a continuing relationship with Solar

Mosaic or any other Defendant because it does not like their business model of adding hidden finance fees.

152.    Powerfully Green is another Minnesota solar company that had a relationship with and sold seven systems financed by Solar Mosaic. Most of Powerfully Green's systems are cash sales whereby the company refers the customer to CEE for financing. Powerfully Green's owner explained why it prefers to offer sales financed by CEE and lenders that fully disclose their rates:

> One cause for confusion for customers is that [Solar Mosaic and the other Defendants] charge both interest on the loan (which is disclosed to the customer) and a "dealer fee" that is added on to the price of the system based on a percentage of the cost and as predetermined by the lender. Customers don't generally know about the dealer fee markup. The captive lenders [i.e., Defendants] instruct my company (and other solar sales companies) to not discuss the dealer fee, but it is a significant expense that increases the cost of the system and can make it more difficult for customers to recover the cost of their purchase over time. This is why I instruct my salespeople to recommend and propose cash purchases or financing through CEE, which do not include the dealer fees (however CEE charge[s] a 1% loan fee).

153.    If a customer cannot or will not take out a loan from CEE, Powerfully Green will present them with a sales proposal financed by Solar Mosaic. When it does so, however, it informs the customer of the higher price caused by Solar Mosaic's upfront fee, despite Solar Mosaic's instruction:

> In a handful of instances when I started working with Mosaic, my company would together present the cash price, the price and cost with a loan from CEE, and the price and cost with a loan from Mosaic with the added dealer fee. At some point, however, someone affiliated with Mosaic or an equipment distributor told me that Mosaic did not allow sales companies to talk about the dealer fee and that I cannot offer systems at the baseline cash price alongside the financed price. Instead, this person suggested that I would need to upcharge cash proposals or CEE-financed proposals when presenting those options alongside Mosaic-financed offers so that they are at the same price. I briefly offered one price based on that instruction, but I found the practice nonsensical, impractical, and bad for customers. So, rather than push captive-lender-financed sales under that model, my company generally proposes cash sales or CEE-financed sales at the baseline price (i.e., prices without dealer fees) and as the default option. In the rare case when a customer insists on a

captive-lender sale, I will give them a proposal with that option; but I feel it is right by the customer to inform them of the higher price so they can fully understand their options, even if it goes against Solar Mosaic's instructions.

154.    Zinniel Electric is another Minnesota solar company that had a limited relationship with Solar Mosaic. Zinniel Electric completed one sale financed by Solar Mosaic and the experience from that sale made it stop marketing Solar Mosaic's financing. In this sale, Solar Mosaic imposed its upfront fee, which increased the price of the system by $14,045. Zinniel Electric felt uncomfortable following Solar Mosaic's instructions to market such loans as "low interest" because Solar Mosaic's upfront fee was increasing the price by approximately 15 to 25 percent for financed sales, which the customer would pay in the form of a higher loan balance. As a result, all other systems sold to Minnesota customers by Zinniel Electric have been for cash at its regular price. Zinniel Electric believes these sales are more affordable and better for customers, who typically can use savings or obtain a loan from a traditional bank without paying Solar Mosaic's upfront fees.

155.    TM Electric is another Minnesota solar company that had a relationship with Solar Mosaic. TM Electric has sold eight systems financed by Solar Mosaic. When its contractor signs up a customer, the customer pays TM Electric's cash price plus any amount charged as a commission to the sales contractor. If the customer finances with Solar Mosaic, however, Solar Mosaic's upfront fee is also added on to the price and loan balance. TM Electric prefers to offer cash deals because they do not include the added upfront fee and are thus better for customers.

156.    Centauri Systems is another Minnesota company that had a relationship with and sold nine systems financed by Solar Mosaic. Centauri Systems' sales practices as to Defendants' upfront fees are described in paragraph 119 above as to Sunlight Financial and are the same for Solar Mosaic.

157.    Empire Solar is another Minnesota company that had a relationship with and sold four systems financed by Solar Mosaic. Empire Solar's sales practices as to Defendants' upfront fees are described in paragraph 55 above as to GoodLeap and are the same as to Solar Mosaic.

### C. Solar Mosaic's Reliance on Contractual Fictions to Evade Disclosure Requirements

158.    Because federal and state laws require that lenders include all costs imposed as an incident of credit be included in the calculation of the "finance charge" and "annual percentage rate" prominently disclosed to consumers, Solar Mosaic devised contracts with Minnesota solar companies that purport to disguise its upfront fee as an overhead cost incurred by the Minnesota solar company rather than a cost of credit. But Solar Mosaic's upfront fee is paid by the borrower, at Solar Mosaic's direction, as a condition of financing. Solar Mosaic's contract with Minnesota solar companies in other paragraphs makes clear that the Minnesota solar company will charge and collect a cash price (called the "Net Loan Amount" in the contract) and that Solar Mosaic's upfront fee is added to that price to constitute the original loan balance (called the "Contract Price" or the "Loan Amount" in the contract) owed by the consumer. The upfront fee is incurred and paid by the borrower, not the Minnesota solar company.

159.    Pursuant to this fiction, Solar Mosaic also includes a provision in its contracts with Minnesota solar companies purporting to require that financed sales not feature a "price increase" on account of "any fees in connection with obtaining financing" from Solar Mosaic and "may treat such fees as overhead" and charge cash customers the same upcharge.  But, as detailed above, this contract provision is impractical, not followed by Minnesota solar companies, and not checked or verified by Solar Mosaic. Regardless of the provision, Solar Mosaic's sales partners add the upfront fee to the cash-sale price as a condition of financing. The only exception is Everlight Solar, which does not actually sell "cash" systems in the regular course of business in Minnesota.

160.    Similar to Sunlight Financial, Solar Mosaic further undermined its contractual provision by including a clause in some versions of its contract that stated that it would "not prohibit [the Minnesota solar company] from offering price discounts to Customers electing to pay the entirety of the applicable Contract Price in cash." This provision does not appear in all contracts but reflects the general practice for cash sales that do not include the markup attributed to Solar Mosaic's upfront fee.

161.    Solar Mosaic's agreement also refers to the upfront fee as "seller's points" in its contract. One of Mosaic's biggest solar sales partners, Everlight Solar, didn't understand that term in the context of consumer lending and didn't know what the fees pay for. A representative for another large Solar Mosaic partner, Wolf River Electric, did not understand what "points" were for purposes of their lending arrangements with Defendants.

162.    Solar Mosaic's contractual provisions deeming the upfront fee as overhead represent a fiction or contrivance devised to evade loan-disclosure laws.

### D.  Solar Mosaic's Ineffective and Misleading Disclaimer

163.    Solar Mosaic's "Truth in Lending Disclosure" document lists on its second page a disclaimer in small print that states, "The Installation Contractor may provide us a fee or discount against the Amount Financed noted herein" and that "[t]he Amount Financed shown is not reduced by any such fee or discount." This statement is in small print and unlikely seen by customers, let alone seen and understood before they agree to finance with Solar Mosaic.

164.    The above statement also comes after Solar Mosaic's artificially low interest rate is emphasized in both the sales proposal and loan documentation. In addition, the statement itself is misleading: it says the sales company "*may* provide us a fee or discount" (emphasis added). In reality, Solar Mosaic both knows and directs that its fee be added to and included in the purchase

price and loan amount and knows and directs that the fee is paid by the consumer. It would also be unclear and confusing to consumers to be told that the Minnesota solar company is providing a "discount' to Solar Mosaic.

165.    Nor do the above small-print statements convey the actual amount of Solar Mosaic's upfront fee, which averages nearly $6,000 per customer and significantly increases the cost of the system above the cash price unbeknownst to the consumer.

166.    The Loan Agreement's sixth page also includes buried language stating that "the Installation Contractor has agreed that we can satisfy the Amount Financed on Your behalf by disbursing less than the Amount Financed," but that regardless of that withheld amount "You agree to be bound to repay the full Amount Financed amount set forth in the TILA Disclosure." Again, the statement does not identify the amount of the upfront fee and is unclear and ineffective in correcting a reasonable consumer's confusion and misapprehension that the loan proceeds fund the purchase of their system and not financing, and that the cost of financing is the low "finance charge" amount identified in the loan documents.

## E. Solar Mosaic Was Not Properly Licensed Until 2023 and Charged Interest Rates Above Applicable Usury Caps

167.    During the time in which Solar Mosaic has been engaged in the business of making loans to consumers in Minnesota, it was not licensed by the Minnesota Department of Commerce until March 2, 2023. Nor was Solar Mosaic a bank, savings association, trust company, licensed pawnbroker, or credit union exempt from lender-licensing requirements under Minnesota law.

168.    During this time in which it was not licensed, Solar Mosaic issued at least 2 loans that charged effective APRs (i.e., APRs calculated with Solar Mosaic's upfront fees included as finance charges) between 8.80 and 10.84% and thus exceeding Minnesota's usury rate for written loan contracts.

51

169.    In addition to those 2 loans, 128 Solar Mosaic borrowers paid their loans off early, resulting in adjustments to their effective APRs to between 21.76 and 459.94% and further exceeding allowable annualized rates for regulated financial institutions under Minnesota law, requiring refunds. The average finance charge exceeding the allowable amount for these 128 consumers was nearly $2,500. These borrowers, however, were not refunded by Solar Mosaic after their early payoff.

### F.  Solar Mosaic's False Statements about Obligations to Repay

170.    Many sales financed by Solar Mosaic have been subject to claims of misrepresentations and overpromised installation timelines. Several of Solar Mosaic's partners are alleged to have routinely made such misrepresentations and become insolvent, ceased operating, or filed for bankruptcy—including Altaray Solar, Avolta Power, and Empire Solar.

171.    Under the "Holder" Rule described in paragraph 127 above, consumers can assert defenses to repayment on their loan or assert a claim for past loan payments made to a creditor with a qualifying relationship to the seller of the product or service subject to alleged misrepresentation or failed performance. Solar Mosaic has such a relationship with Minnesota solar companies and was required to (and did) insert "Holder Rule" language in its loan documents. *See* 16 C.F.R. Part 433. Thus, Minnesota consumers have a defense to repayment of their Solar Mosaic loans based on nonperformance, misrepresentations, or false promises made by the solar company that sold the system financed by Solar Mosaic.

172.    But while Solar Mosaic includes the Holder Rule language in loan agreements, it gives contradictory and misleading statements to Minnesota consumers about their obligation to repay loans to purchase systems and their defenses to repayment under the Holder Rule.

173.    Namely, Solar Mosaic loan documents include a paragraph captioned "Promise to Pay" that states, "You agree to resolve directly with the Installation Contractor any complaint about the Installation Contractor's services and/or any concerns related to system performance and further agree that no such complaint will limit or impair your obligation to make payments hereunder."

174.    Consistent with the above statement in the loan documents rejecting that loan payments are tied to misrepresentations and performance issues by its partner Minnesota solar companies, Solar Mosaic responds to complaints raised to the Minnesota Attorney General's Office with letters stating that its partner solar companies are not "affiliates" of Solar Mosaic and that Solar Mosaic is not responsible because it "was not physically present and did not participate in the direct sale or installation of the solar system." Solar Mosaic states, "[t]o the extent that the Borrower's concerns are based on any actions, statements, omissions or representations made during the sales and/or installation process, Mosaic cannot speak to those and instead they should be directed to the Borrower's installer." It states that concerns about misrepresentations and failure of performance are "improperly addressed to Mosaic."

175.    These above statements by Solar Mosaic are false and undermine the message and policy of the Holder Rule. They misled and confused consumers about their rights and obligations to repay loans when their systems were not installed and operational or were subjected to other misrepresentation by Minnesota solar companies that partnered with Solar Mosaic.

**V.    DEFENDANT DIVIDEND**

176.    Dividend has been engaged in the business of making loans in Minnesota starting in September 2022 when it was a nonbank LLC and continues to make loans to finance purchases of residential solar-panel systems in Minnesota as Fifth Third Bank N.A. dba Dividend Finance

following the entities' merger in July 2023. Dividend was not licensed with the Department of Commerce, though it was an operating subsidiary of Fifth Third Bank N.A. from May 2022 until the merger in July 2023 and is now merged with the national bank. Through May 2023, Dividend made at least $14,104,831 in loans to 257 Minnesota consumers.

### A. Dividend's Sales Model and Representation to Consumers

177.    Like the other Defendants, Dividend partners with Minnesota solar companies to market Dividend's loans to finance purchases of the Minnesota solar companies' solar-panel systems. Minnesota solar companies that have partnered with Dividend are Wolf River Electric (127 financed sales), All Energy Solar (90 financed sales), Everlight Solar (37 financed sales), and Sun Badger Solar (3 financed sales).

178.    Dividend dictates the terms and methods for Minnesota solar companies to market and sell its loans. It provides training to Minnesota solar companies on how to market its loan products, including a video training and training slides on its loan products and how to sign consumers up for its loans.

179.    Dividend also provides solar companies with a tool for designing sales proposals around its loans. Minnesota solar companies that partner with Dividend include features of the loans as a prominent and important component of their sales proposals. Dividend emphasizes a "low APR & low fee products" in presentations to Minnesota solar companies.

180.    Dividend's loan options are available to any Minnesota consumer who purchases from one of its partner Minnesota solar companies and meets baseline qualification standards, including a minimum credit score and home ownership. The individualized interest rate and fees applicable to a given borrower are not based on individualized credit risk; instead, the annual interest rate and fees for a given loan product are the same for every qualifying borrower.

181.    The sales proposals used by Dividend's Minnesota solar companies will feature the loan and emphasize a low annual percentage rate that does not include Dividend's upfront fee in the calculation. Sales proposals for financed systems also identify a total price that does not identify that it includes Dividend's upfront fee. Like other sales proposals, those that feature Dividend loans emphasize low monthly installment payments (promised to be matched by savings on utility bills derived from purchased solar-panel systems) over the total price.

182.    Once the consumer agrees to finance with Dividend based on the sales proposal, the Minnesota solar company representative will work with the consumer to visit Dividend's portal and enter their name, address, and contact information to apply for the loan. The representative enters the information, loan product, and loan amount—often on the salesperson's tablet.

183.    Dividend emphasizes in trainings and communications to Minnesota solar companies that its financing process and application approval process are "fast" and executed on the salesperson's tablet during their sales visit. It tells solar companies to "Focus on Selling, Not Fixing Paperwork" and that they can "Sell, Close, & Go On To The Next One" by using and marketing their loans to finance consumers' purchases. Dividend also offers prizes to salespersons that reach thresholds for loan sales, such as gift cards and devices.

184.    When a customer is signed up for a loan with the salesperson, Dividend will email loan documents to the consumer. As part of the package of emailed documents, Dividend includes a document that identifies "Truth in Lending Disclosures" including the "annual percentage rate" described as "the cost of your credit as a yearly rate," the "finance charge" described as "the dollar amount the credit will cost you," and the "amount financed" described as "the amount of credit provided to you or on your behalf."

185.    The statement further provides an "itemization of amount financed" that breaks down the stated amount financed as entirely including the "principal amount of loan" that is the "amount[] paid to others on your behalf…to seller/contractor for collateral/installation." The finance charge and annual percentage rate identified in the document does not include Dividend's upfront fee in either calculation.

186.    Dividend also emails a "Your Loan Summary" document to the consumer that identifies the same low rate as provided as the APR in the Truth in Lending Disclosures document.

187.    Minnesota solar companies that partner with Dividend also communicate that the loan amount identified in the loan documents reflects the amount that is paid to the Minnesota solar company to pay for parts and installation of the system.

188.    Dividend also has conducted calls to borrowers when they execute loan documents. In those calls, they advise and confirm with the borrower that they "agree that the proceeds from the loan will be used to pay for the design and installation of your solar project …, as further described in the purchase or work order between borrower and contractor."

189.    Dividend's loan documents further identify late charges and returned payment fees. No other fees, including the upfront fee, are identified.

**B.  Dividend's Hidden Finance Fee**

190.    Like with the other Defendants, the largest cost to the consumer charged by Dividend as part of the loan is the large upfront fee imposed at the time of origination and added to the balance of the loan unbeknownst to the consumer. As noted above, the upfront fee is not included in the calculated "finance charge" or APR disclosed as the cost of financing to the consumer, nor is it otherwise disclosed or identified in any way at any time in the marketing, sales, and loan execution.

191.    Dividend's upfront fee is charged by Dividend on loans as a percentage of the loan balance, up to 31 percent and added to the balance when the loan is originated. While it is part of the loan balance taken out and owed by the consumer, the upfront fee is not disbursed to the Minnesota solar company for parts and installation. It is instead retained by Dividend. The upfront fee is part of the loan balance that the consumer must repay over time, though a large portion (if not all) of the fee amount is paid by the consumer early in the loan's term if the consumer makes the tax-credit payment.

192.    The average amount of Dividend's upfront fee is 18.8 percent of each borrower's loan amount (including a small number of loans with 0 percent fees). The average amount charged to borrowers and added to their loan balance is $9,041.69.  Dividend has charged a total of at least $2,323,714.32 in upfront fees to Minnesota consumers.

193.    The exact percentage of Dividend's upfront fee for a given loan depends on the loan's term and annual interest rate, as selected by the Minnesota solar company that made the sale. Dividend offers various loan products with different durations, rates, and corresponding upfront fees. These loan options are presented to Minnesota solar companies to choose from when marketing Dividend's loans.

194.    Minnesota consumers that purchase systems from Minnesota solar companies that partner with Dividend may alternatively purchase systems by securing their own funding for the purchase, either with existing cash assets or through arranging their own loan from a credit union or traditional bank. Minnesota solar companies generally charge their regular cash price—i.e., their price without Dividend's upfront fee added—to those who express sufficient interest or request cash offers. In other words, Dividend's upfront fee is only charged as a condition of financing and is not paid by cash customers.

195.    Wolf River Electric is Dividend's largest-volume seller. It's sales practices as to Defendants' upfront fees are described in paragraphs 145 through 146 above as to Solar Mosaic and are the same for Dividend.

196.    All Energy Solar is Dividend's second largest-volume seller. Its sales practices as to Defendants' upfront fees are described in paragraphs 101 through 105 above as to Sunlight Financial and are the same for Dividend. As discussed therein, All Energy Solar would only propose alternative cash and financing proposals when the customer specifically sought out both options and, in those cases, All Energy Solar would generally modify the warranty offered for the higher-priced financed proposal (though sometimes the salesperson did not make this change). Dividend was aware of and approved this practice like Sunlight Financial.

197.    Everlight Solar is Dividend's third largest-volume seller. Its sales practices as to Defendants' upfront fees are described in paragraph 147 above as to Solar Mosaic and are the same for Dividend.

198.    Sun Badger Solar is Dividend's fourth largest-volume seller. Its sales practices as to Defendants' upfront fees are described in paragraphs 107 through 113 above as to Sunlight Financial and are the same for Dividend.

C. **Dividend's Reliance on Contractual Fictions to Evade Disclosure Requirements**

199.    Because federal and state laws require that lenders include all costs imposed as an incident of credit be included in the calculation of the "finance charge" and "annual percentage rate" prominently disclosed to consumers, Dividend devised contracts that purport to disguise the charge as an overhead cost incurred by the Minnesota solar company rather than a cost of credit borne by the borrower. But Dividend's fee is paid by the borrower, at Dividend's direction, as a condition of financing. Dividend's contract in other paragraphs makes clear that the Minnesota

solar company will charge and collect a cash price (called the "net amount of the Loan proceeds" in the contract with Minnesota solar companies) and that Dividend's upfront fee is added to that price to constitute the original loan balance (called the "Contract Price," the "Loan Agreement value," and the "Loan proceeds" in the contract) owed by the consumer. The fee is incurred and paid by the borrower, not the Minnesota solar company.

200.    Pursuant to this fiction, Dividend also includes provisions in its contracts with Minnesota solar companies purporting to require that financed sales be priced "no more than [the system's] actual cash value" and that the sales company has "not increased the purchase price … or added any additional fee for financing" for sales financed by Dividend. But this contract provision is impractical, not followed by Minnesota solar companies, and not checked or verified by Dividend. Regardless of the provision, Dividend's sales partners add the fee to the cash price as a condition of financing.

201.    Dividend's contracts also provide confused and contradictory rationales for the upfront fee that further undermine the company's false claim that it is an overhead cost borne by solar companies. The contract refers to it as a "Contractor Fee" for "services rendered in connection with the [loan] Program" but also states that the fee "may also include Platform Fees and Management Fees" not defined in the contract itself. Another Dividend policy document describes the management fee as "consideration for" the "lead[s]" that result in the sale and describe the platform fee as "consideration for [the solar company's] nontransferable right to access and use [Dividend's] origination platform." Wolf River Electric and All Energy Solar had no knowledge of the fee being paid for a service related to Dividend's platform or management.

202.    Dividend's partner Minnesota solar companies viewed the fee as an amount added to the loan to procure low interest rates (like traditional "points" paid by the borrower at the outset

of a loan). Everlight Solar did not have any understanding as to why the upfront fee could be called a "platform fee" or Dividend's other labels. When showed a document referenced in the contract that refers to the upfront fee as a "platform fee" paid "in consideration for [the solar company's] nontransferable right to access and use [Dividend's] origination platform," Everlight Solar's CEO said it was the first time he had ever heard of the upfront fee described for that purpose.

203.    Dividend's contractual provisions represent a fiction or contrivance devised to evade loan-disclosure laws.

## VI.    DEFENDANTS' PRACTICE TO HIDE THEIR LARGE UPFRONT FEES HARM CONSUMERS AND COMPLIANT BUSINESSES

204.    Defendants' loans have had a significant impact on Minnesota's consumers and market for residential solar-panel systems. As described above, Minnesota solar companies have come to frequently feature Defendants' loans as the preferred or default method for paying for systems in a way that does not permit consumers to consider and compare costs to paying in cash or different forms of credit.

205.    The Minnesota solar companies that partner with Defendants have confirmed that the low APRs marketed with their systems are highly attractive to consumers and that higher (but accurate) APRs would drive away customers from financing if they were disclosed to and understood by consumers.

206.    Demonstrating this point, Defendants have come to offer low or 0% fee loans with higher disclosed interest rates that Minnesota solar companies generally reject as unattractive. As stated by the CEO of one company, "I don't understand why any [ solar company] would want a higher APR Loan and offer that to their customer in any scenario…." Another installer similarly expressed that customers would be "scared away by [a] higher APR" with low-fee loan products

and "don't necessarily look into the cost of the product, meaning the dealer fee." In other words, hiding a consumer's financing cost in the price and principal balance of the loan is intended to and does induce consumers to purchase systems using Defendants' loans from the Minnesota solar companies that work with Defendants and do so with Defendants' loans.

207. The impact on the market in Minnesota is significant. Defendants have collected an estimated $35 million in hidden fees from Minnesota consumers since 2017. These fees have been added to the regular price for and inflated the cost of over 5,000 systems purchased by Minnesota consumers where consumers were not adequately informed of this cost of Defendants' financing.

208. Defendants' practice also undermines and subverts the purpose of the solar tax credit. As discussed above, the solar tax credit can only be applied to the cost paid by the consumer for hardware, installation, and other expenses related to purchase of a residential solar-panel system. Costs of financing are not eligible for the tax credit. Thus, burying almost the entire financing cost in the stated "price" that consumers believe they have paid for the system causes larger claimed tax credits and a direct cost on the federal fisc and taxpayers.

209. The erroneously low APR and finance charge disclosed to consumers also is part of a model that discourages consumers from taking their time and considering other options for purchase or payment, enabling a rushed sales process that has become too common for some sellers in Minnesota. As described above, a key aspect of Defendants' model touted to Minnesota solar companies is a rushed loan process that can be conducted in a single live sales visit, with loan documents emailed after the consumer agrees to proceed with the purchase and financing based on the low APR listed in the sales proposal. This hurried process used to place consumers in significant debt is made much easier when the consumer is unaware of the true cost of financing.

210.    Accordingly, several of the highest-selling Minnesota solar companies that utilize Defendants' lending model are subject to patterns of complaints concerning high-pressure and deceptive sales practices. For example, solar companies that feature Defendants' loans heavily emphasize the amount of monthly payments to be offset by promised utility-bill savings (that may not be realistic or accurate), as opposed to the overall cost. This is an important feature of sales proposals pushed by Defendants and used by partner Minnesota solar companies. When the stated finance cost is minimal and concern about the cost of financing is alleviated, these sale methods are more effective.

211.    The total price inflated by Defendants' upfront fee is overlooked because it is not a prominent feature of the sales proposal, while the low disclosed APR and low monthly payment are emphasized and attractive to consumers.

212.    Despite the dominant role of Defendants' loans in the market, several Minnesota solar companies have declined to enter or continue relationships with Defendants because of their negative impact on customers. Instead, these companies generally point customers that cannot afford to pay for systems up front to banks and credit unions that offer loans that finance residential solar-panel projects or home equity lines of credit and which do not charge large hidden fees.

213.    For example, the owner and chief operator of Greenway Solar Services states that the lending model used by Defendants hides important costs from the consumer:

> Based on my knowledge of the solar sales industry in Minnesota and how [Defendants] operate, I believe that the finance fees they charge are too high and are not explained to consumers. I also believe that the sales model used to sell systems financed by the above lenders and promoted by those lenders is designed to downplay the higher total price and to emphasize the monthly loan payment. **I do not believe this model adequately informs the customer about the actual cost of their system.** This sales model is also more often used by less legitimate companies, some of which have gone out of business and left consumers with uninstalled or faulty systems that other companies (like Greenway) have needed to step in to complete. (Emphasis added.)

The Greenway Solar owner further states that, while it is generally known within the industry that Defendants' contracts on their face require commensurate price increases for cash customers, this directive is not workable.

214. The owner of another Minnesota solar company, Powerfully Green, states that financial institutions that offer alternatives to Defendants' loans inform customers about financing costs and are thus preferred, but Defendants cause confusion when customers try to compare costs:

> I strongly prefer to sell systems for payment in cash or through a loan with [CEE] rather than [Defendants]. Unlike the [Defendant] lenders, the customer applies for and processes their loan directly with CEE, though my company may be informed that the customer is working with CEE and can include details about a potential CEE loan in our sales proposals. CEE discloses the loan terms directly to customers without involvement from Powerfully Green.

> I prefer cash sales or financing through CEE because those options are transparent and more cost effective for my customers than the [Defendant] lenders. **It can be, however, difficult to explain or compare those cost options, especially when customers receive multiple bids from companies that use the captive lenders. This is because the numbers presented around solar sales and financing can be difficult to comprehend for consumers not experienced and knowledgeable about how the industry works.** (Emphasis added.)

215. Powerfully Green's owner further explained that, in his experience with Defendants' loans, they are often tied to other problems with the sales process:

> I feel that companies that sell through [Defendants] are more often national companies that operate out of California or Utah. I believe that customers are often also confused about other aspects of those companies' sales proposals. For example, many customers I encounter that received proposals from those companies are told that their monthly utility bill will be completely offset by the energy generated from their solar panels. That, however, is very rare, and I insist on being honest with customers that their entire energy bill will not be wiped out. Again, I believe that these are mostly (but not exclusively) out-of-state companies that engage in these practices. For example, I recently encountered a woman who purchased a solar panel system for $90,000 from a Utah-company called Avolta. I believed that this system was not affordable for her and that she was misled about the costs and savings she would get, but I was also troubled by the idea that she paid 30% of the system cost as a financing fee that she did not know about.

216.   The owner and CEO of another Minnesota solar company—TruNorth Solar—states that that his company had declined to enter relationships with Defendants because he believes that "the loan products they offer are not good for TruNorth's customers." Instead, he directs customers to lenders that accurately disclose financing costs. He states that, "while the disclosed interest rates offered for the [Defendants'] loans may appear lower [than other lenders], [Defendants] charge a 'dealer fee' that must be added to the balance of each loan financing a purchase. For those sales, the customer may think they are getting a good deal on their loan because of a low APR and a low monthly payment. But the overall cost of the system is higher because they are financing and consumers end up paying more over time because of the higher price."

217.   TruNorth's CEO also explained how Defendants' hidden upfront fees lead to other problems and misrepresentations in the sales process:

> Because the dealer fee adds to the cost of the system, [Defendant's] model can lead solar sellers to overstate projected energy cost savings in order to claim that those savings will offset monthly payments on loans. I currently believe that a 2.8 – 3.2% projected annual increase in utility costs is justified based on Xcel Energy's rate history, and that is what TruNorth currently presents to customers in its proposals. I have heard of and seen other installers use higher inflation rates.

> The loan products offered by [Defendants] also require a large payment made to the lender within 18 months of each sale to avoid the loan re-amortizing to a higher monthly payment. When consumers don't receive the tax credit or do not have funds to pay the tax-credit amount towards their loan, their payment could significantly increase in a way they did not expect. I am concerned that this model creates confusion and lacks transparency. My sales approach, on the other hand, is to make sure the customer fully understands the transaction and how much they will pay for their solar panels.

218.   The owner and chief manager of another Minnesota solar company, MN Solar and More LLC, similarly explained that her business does not push Defendants' loans because they mislead consumers:

> The reason that I do not believe that [Defendants' loans] … are good for customers is that they charge both interest and also so-called "dealer fees" that are added to

the cost of systems they finance. This dealer fee upcharge inflates the overall cost of the financed system presented to the customer and makes it harder for customers to pay for their investment over time. **The marketing for these loans emphasizes low monthly payments and a low interest rate, obscuring the inflated cost of the system that the customer must pay because they are financing**.

From my experience in the industry and with customers who receive offers from other solar-panel installers [] with relationships with the solar lenders, I know that installers with those lender relationships typically offer a "cash price" and a "financed price." The "cash price" is the actual price of the system charged by the installer, while the "financed price" includes the dealer fee. I assume that customers who don't ask for these options wouldn't necessarily know about the cash price available from those installers. Thus, I sometimes have to explain to potential customers why my competitors' bids are so much more for the same size system where the competitor's offer is financed. (Emphasis added.)

219.    The owner of Wolf Track Energy, discussed above with regard to a prior relationship with Sunlight Financial, explained why Defendants' lending model was misleading and often associated with high-pressure sales tactics:

I view solar panels as an investment for my customers, whereby they can pay for their purchase through reduced energy and utility costs over time. However, to make this investment worthwhile, the overall cost of the purchase needs to be as low as possible. That is my goal in pricing and selling solar panel systems. Because of this concern, I have not been interested in the sales model pushed by Solar Mosaic or any other lender, which would require me to increase the overall cost of the system and thus make it more difficult for the customer to pay off the costs of their investment.

I am also turned off by how the lenders' sales model is built around home solicitation sales that are rushed and high pressure. In my experience in the solar industry, there are two main kinds of solar-panel businesses: the first are experienced electrical contractors who are looking to honestly sell systems and help customers go green and save money, while the second are much more sales-focused and high-pressure. In my view, the financing model employed by Solar Mosaic and the other solar lenders are more oriented towards the second, sales-focused model that can result in poor outcomes for customers and a bad reputation for the industry. I am also concerned that sellers that push financing are more likely to overstate projected energy savings in order to offset the higher cost of the system.

When potential customers cannot afford to purchase a system up front, I encourage them to seek out a loan from a reputable bank or credit union that does not require a large lender fee to be added on to the price of the system. If customers don't have a financial institution that offers such financing, I give them a referral. But I don't

get any fee for those referrals, and the referrals I provide [d]o not use the dealer-fee model described above.

220.   Another Minnesota solar company mentioned above, Cedar Creek Energy, similarly reported while that it tries to educate customers about Defendants' fees, customers with competing bids to be financed by Defendants are often misled and confused about the costs of those systems. Cedar Creek Energy thus must educate customers about Defendants' upfront fees that increase the price of the competitor's system and which it believes should be considered when weighing options for purchase. Cedar Creek Energy states that, if it didn't educate consumers about the upfront fee in competitor proposals, those customers wouldn't know about it.

221.   Another Minnesota solar company mentioned above, Centauri Systems, states that it tries to avoid proposing financing by Defendants and instead prefers to refer customers to banks that do not add fees onto the cost of the system and are thus more cost effective for consumers even if the disclosed APRs are higher.

222.   Another Minnesota solar company mentioned above, TM Electric, similarly confirmed that, while Defendants' loans may have lower interest rates, the added upfront fee and longer loan term often makes it a worse deal for the customer because they are paying more overall to finance with Defendants. TM Electric's owner states that he believes in transparency and so explains the different costs to the customer between cash deals and financing by Defendants. The owner expressed concern about out-of-state solar companies that are focused on maximizing sales and do not provide good value to customers and that Defendants' lending model was more commonly a feature with those companies.

223.   Another Minnesota solar company mentioned above, Zinniel Electric, similarly states that it does not use Defendants' lending model because it didn't believe that the low disclosed finance costs were accurate, due to the exclusion of the upfront fees. The owner states

that cash sales in which they obtain a loan from a traditional lender and avoid hidden upfront fees is more affordable and better for customers.

224.    In sum, Defendants' practices of charging upfront fees buried in the stated price has misled and confused consumers, prevented consumers from comparing the true cost of systems and whether and from whom to take out a loan, undermined important public policy underlying the solar tax credit, encouraged aggressive and deceptive sales practices, and significantly altered the market for solar sales in Minnesota at the expense of consumers and businesses and lenders that comply with the law. As detailed below, these practices violate several Minnesota laws.

**COUNT I**
**(ALL DEFENDANTS)**
**PREVENTION OF CONSUMER FRAUD ACT**
**MINN. STAT. §§ 325F.68-.70**

225.    The State incorporates by reference paragraphs 1 through 224 of this Complaint.

226.    The Minnesota Prevention of Consumer Fraud Act ("MCFA"), Minn. Stat. § 325F.69, provides that the "act, use, or employment" by "any person" of "any fraud, unfair or unconscionable practice, false pretense, false promise, misrepresentation, misleading statement or deceptive practice" that is made "with the intent that others rely thereon in connection with the sale of any merchandise" is "enjoinable as provided in section 325F.70." The representation or practice is actionable "whether or not any person has in fact been misled, deceived, or damaged thereby."

227.    Defendants, acting through their own communications and that of their partner Minnesota solar companies, are "persons" under the MCFA, which is defined to include corporations and any other "business entity" along with "any agent, employee, salesperson, partner, officer, director, member, stockholder, associate, trustee, or cestui que trust thereof."

Minn. Stat. 325F.68, subd. 3. Defendants' loans are "merchandise" under MCFA, which is defined to include "services" and "loans." *Id*, subd. 2.

228.    Defendants, both through their communications to consumers and through their sales partners authorized and directed to market and sell their loans, have repeatedly violated and continue to violate the MCFA by engaging in the fraudulent and deceptive practices described in this Complaint.  This conduct includes but is not limited to the following summarized practices:

-    Using sales proposals and verbal marketing to consumers that purport to identify costs of taking out a loan but failing to identify Defendants' upfront fees or include them in purported calculation of such costs,

-    Failing to disclose or identify the fact that Defendants charge large upfront fees as a condition of extending credit and the amount of such fees,

-    Preventing Minnesota solar companies from otherwise identifying or explaining Defendants' upfront fees to consumers and from discussing less-costly "cash" purchase options;

-    Using sales proposals to consumers that falsely identify a purported price to be paid for parts and installation related to the solar-panel system when in fact a large portion of the stated price and resulting principal balance is paid to/retained by Defendants rather than disbursed to purchase the system;

-    Providing loan documents to consumers that state an annual percentage rate and finance charge that does not include Defendants' upfront fees in the calculation and is inaccurately low;

-    Providing loan documents with an "itemization of amount financed" that falsely represents that the principal loan balance will be paid to the Minnesota solar sales company when in fact a large portion of the stated price and resulting principal balance is paid to/retained by Defendants rather than disbursed to purchase the system;

-    Providing other documents to consumers and otherwise expressing that the price listed in purchase agreements for the solar-panel system sold is for parts and installation and that the principal loan balance will be paid to the Minnesota solar sales company when in fact a large portion of the stated price and resulting principal balance is paid to/retained by Defendants rather than disbursed to purchase the system;

-    To the extent Defendants GoodLeap and Solar Mosaic include fine-print disclaimers concerning the potential for additional costs included in the purchase price, falsely communicating that they do not know whether the upfront fee was charged, failing to identify the significant amount of the fee, and including the disclaimer after the

customer has agreed to make the purchase and received a stated APR in sales proposals and loan documents that does not include the upfront fee in the calculation of financing costs.

Each of the above practices (a) provide individual and independent bases for injunctive and other relief and (b) together create a false net impression for Defendants' borrowers that the principal balance of their loan pays for parts and installation of the solar-panel system and that the cost of Defendants' loans is negligible and reflective only of the annual interest rate charged after origination and repayment begins.

229.    Defendants, both through their communications to consumers and through their sales partners authorized and directed to market and sell their loans, have also repeatedly violated and continue to violate the MCFA by engaging in the unfair practices described in this Complaint. "Unfair" for purposes of the MCFA is defined to include "any method of competition, act, or practice that: (1) offends public policy as established by the statutes, rules, or common law of Minnesota; (2) is unethical, oppressive, or unscrupulous; or (3) is substantially injurious to consumers." Specifically, Defendants' above-described unfair acts or practices include, but are not limited to the following summarized practices:

- Defendants take advantage of unequal knowledge and bargaining positions and prevent consumers at such a knowledge disadvantage about Defendants' solar loans from understanding and comparing costs of payment options for solar-panel purchases;

- Defendants hide financing costs that consumers reasonably expect to be disclosed and bury such costs in the stated price and original principal owed and paid by the consumer while downplaying the cost in sales proposals built around a low monthly payment;

- Defendants participate in consumer-lending practices that offend Minnesota public policy related to full disclosure of lending terms as reflected in the Regulated Loan Act, Minn. Stat. §§ 56.12 & 56.14 (requiring regulated lenders to disclose finance charges), and Minnesota Consumer Credit Code, Minn. Stat. § 47.59, subd. 12 (requiring all other financial institutions to disclose finance charges); and

- Defendants prevent, for sales by Minnesota solar companies that do not offer cash options in the regular course of business and that add Defendants' fee onto their

purchase price, consumers from understanding and inquiring about the higher cost of the system compared to most sellers that offer lower-priced cash sales that do not include Defendants' fees.

Each of the above practices (a) provide individual and independent bases for injunctive and other relief and (b) taken together demonstrate the unfairness of Defendants' acts and practices, which prevent borrowers from understanding Defendants' lending terms and how they compare to other payment options.

230.     The above deceptive and unfair practices were and are undertaken by Defendants with the intent that consumers rely thereon in connection with the sale of Defendants' loans. As described above, the cost of financing is an obvious material term for consumers in determining whether to (a) purchase a system, (b) take out a loan to finance the purchase, and (c) finance from a particular company at a particular stated rate. Misrepresenting and hiding the true cost of financing as described above is intended to induce more consumers to purchase from Defendants' partner Minnesota solar companies and finance those purchase through Defendants' loans.

231.     Many of the misleading and unfair practices identified above concern affirmative communications to consumers concerning the price of systems and cost of financing and tend to create a false net impression for consumers concerning those material aspects of sales. But to the extent such conduct is in any respect deemed to constitute any kind of omission or failure to disclose, Defendants had and have a duty to disclose such material information related to the cost of financing because, among other circumstances detailed in the general allegations above:

- Defendants and their partner Minnesota solar companies have special if not exclusive knowledge concerning the upfront fees charged by Defendants and added to the stated price of systems offered for purchase;

- Defendants and their partner Minnesota solar companies have special knowledge that consumers may be able to purchase systems for cash prices that do not include the upfront fees and that can be financed by other lenders that do not impose such upfront fees;

- Minnesota solar companies that partner with Defendants offer and describe themselves to consumers as consultants and experts in identifying options for paying for or financing purchases from consumers;

- Minnesota laws (as referenced in paragraph 229) create a duty and expectation to accurately and prominently disclose the finance charge and annual percentage rate; and

- Disclosure is required to correct the misleading representations and impression from Defendants and the Minnesota solar companies that (a) the stated price for financed systems is for hardware and installation, not financing and (b) the APR stated in sales proposals (and also loan documents) represents the actual cost of financing.

232.    Defendants' misrepresentations have caused harm to Minnesota consumers such that consumer restitution and/or disgorgement is an appropriate remedy. This includes refunds for loan repayments and debt relief from loan balances attributed to hidden fees. As detailed in the general allegations above, Defendants have collected an estimated $35 million in hidden fees from Minnesota consumers since 2017, inflating the cost of nearly 5,500 systems at the expense of consumers who may never have taken out a loan from Defendants if they would had been informed of the true cost of financing. Defendants' practice has skewed sales towards their financing, prevented comparison shopping, and given Defendants and their partners an inflated share of the market at the expense of lenders and businesses that obey the law.

233.    Additionally, Defendants Sunlight Financial and Solar Mosaic further engaged in misrepresentation by making statements that loan repayment obligations are independent of misrepresentations and failures of performance caused by the Minnesota solar company that partnered with Sunlight Financial and Solar Mosaic and sold the system. These misrepresentations were intended to induce Minnesota consumers to rely on them and believe they had no defense to repayment, when in fact the Holder Rule—adopted and incorporated by the Minnesota Uniform Commercial Credit Code, Minn. Stat. § 336.3-305(e)—provides for a defense to repayment on the loans based on any defenses that could be asserted against the seller. These misrepresentations

were also unfair in that they offend and undermine public policy, are unethical, oppressive, or unscrupulous, and/or substantially injure consumers who are affected and deterred from asserting their rights.

234.    Defendants' conduct, practices, actions, and material omissions described in this Complaint constitute multiple, separate violations of the MCFA, Minn. Stat. §§ 325F.68-.70.

**COUNT II**
**(ALL DEFENDANTS)**
**UNIFORM DECEPTIVE TRADE PRACTICES ACT**
**MINN. STAT. §§ 325D.43-.48**

235.    The State incorporates by reference paragraphs 1 through 224 of this Complaint.

236.    The Uniform Deceptive Trade Practices Act ("UDTPA") provides that a "person …. engages in a deceptive trade practice" in violation of the statute when "in the course of business, vocation, or occupation," they do any of the following:

- "causes likelihood of confusion or of misunderstanding as to the source … of goods or services,"

- "represent[] that goods or services have … characteristics, uses, [or] benefits … that they do not have,"

- "makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions,"

- "represents that goods or services are of a particular standard, quality, or grade … if they are of another,"

- "advertises goods or services with intent not to sell them as advertised,"

- "engages in (i) unfair methods of competition, or (ii) unfair or unconscionable acts or practices" or

- "engage[] in any other conduct which similarly creates a likelihood of confusion or of misunderstanding."

Minn. Stat. § 325D.44, subd. 1(2), (5), (7), (9), (11), (13), (14). Deceptive practices under section 325D.44 may be enjoined without "proof of monetary damage, loss of profits, or intent to deceive." *Id.*, subd. 2.

237. Defendants are "persons" within the meaning of section 325D.44, which includes corporate entities. *See* Minn. Stat. § 645.44, subd. 7 (defining "person" generally). Defendants are subject to the UDTPA because they engage in a "course of business" (i.e., consumer lending) in Minnesota pursuant to subdivision 1 of section 325D.44.

238. Defendants, both through their communications to consumers and through their sales partners authorized and directed to market and sell their loans, have repeatedly violated and continue to violate the UDTPA by engaging in the deceptive practices described in this Complaint. This conduct includes, but is not limited to:

- Using sales proposals and verbal marketing to consumers that purport to identify costs of taking out a loan but failing to identify Defendants' upfront fees or include them in purported calculation of such costs,

- Failing to disclose or identify the fact that Defendants charge large upfront fees as a condition of extending credit and the amount of such fees,

- Preventing Minnesota solar companies from otherwise identifying or explaining Defendants' upfront fees to consumers and from discussing less-costly "cash" purchase options;

- Using sales proposals to consumers that falsely identify a purported price to be paid for parts and installation related to the solar-panel system when in fact a large portion of the stated price and resulting principal balance is paid to/retained by Defendants rather than disbursed to purchase the system;

- Providing loan documents to consumers that state an annual percentage rate and finance charge that does not include Defendants' upfront fees in the calculation and is inaccurately low;

- Providing loan documents with an "itemization of amount financed" that falsely represents that the principal loan balance will be paid to the Minnesota solar sales company when in fact a large portion of the stated price and resulting principal balance is paid to/retained by Defendants rather than disbursed to purchase the system;

- Providing other documents to consumers and otherwise expressing that the price listed in purchase agreements for the solar-panel system sold is for parts and installation and that the principal loan balance will be paid to the Minnesota solar sales company when in fact a large portion of the stated price and resulting principal balance is paid to/retained by Defendants rather than disbursed to purchase the system;

- To the extent Defendants GoodLeap and Solar Mosaic include fine-print disclaimers concerning the potential for additional costs included in the purchase price, falsely communicating that they do not know whether the upfront fee was charged, failing to identify the significant amount of the fee, and including the disclaimer after the customer has agreed to make the purchase and received a stated APR in sales proposals and loan documents that does not include the upfront fee in the calculation of financing costs.

Each of the above practices (a) provide individual and independent bases for injunctive and other relief and (b) together create a false net impression for Defendants' borrowers that the principal balance of their loan pays for parts and installation of the solar-panel system and that the cost of Defendants' loans is negligible and reflective only of the annual interest rate charged after origination and repayment begins.

239.    Defendants, both through their communications to consumers and through their sales partners authorized and directed to market and sell their loans, have also repeatedly violated and continue to violate the UDTPA by engaging in the unfair practices described in this Complaint. "Unfair" for purposes of the UDTPA is defined to include "any method of competition, act, or practice that: (1) offends public policy as established by the statutes, rules, or common law of Minnesota; (2) is unethical, oppressive, or unscrupulous; or (3) is substantially injurious to consumers." *See* Minn. Stat. § 325D.44, subd. 2(b) (referring to MCFA's definition of "unfair" acts). Specifically, Defendants' above-described unfair practices include, but are not limited to the followi8ng summarized practices:

- Participating in consumer-lending practices that offend Minnesota public policy related to full disclosure of lending terms as reflected in the Regulated Loan Act, Minn. Stat. §§ 56.12 & 56.14 (requiring regulated lenders to disclose finance charges), and

Minnesota Consumer Credit Code, Minn. Stat. § 47.59, subd. 12 (requiring all other financial institutions to disclose finance charges);

- Taking advantage of unequal knowledge and bargaining position and preventing consumers at a knowledge disadvantage about Defendants' loans from understanding and comparing costs of payment options for solar-panel purchases;

- Hiding financing costs that consumers expect to be prominently disclosed and burying such costs in the stated price and original principal owed and paid by the consumer while downplaying the principal cost in sales proposals built around a low monthly payment; and

- Preventing, for sales by Minnesota solar companies that do not offer cash options in the regular course of business and that add Defendants' fee onto their purchase price, consumers from understanding and inquiring about the higher cost of the system compared to most sellers that offer lower-priced cash sales that do not include Defendants' fees.

Each of the above practices (a) provide individual and independent bases for injunctive and other relief and (b) taken together demonstrate the unfairness of Defendants' acts and practices, which prevent borrowers from understanding Defendants' lending terms and how they compare to other payment options.

240.    The above deceptive and unfair practices were and are undertaken by Defendants with the intent that consumers rely thereon in connection with the sale of Defendants' loans. As described above, the cost of financing is an obvious material term for consumers in determining whether to (a) purchase a system, (b) take out a loan to finance the purchase, and (c) finance from a particular company at a particular rate. Misstating and hiding the true cost of financing as described above is intended to induce more consumers to purchase from Defendants' partner Minnesota solar companies and finance those purchase through Defendants' loans.

241.    The misleading and unfair practices above concern affirmative communications to consumers concerning the price of systems and cost of financing and tend to create a false net impression for consumers concerning those material aspects of sales. But to the extent such

conduct is in any respect deemed to constitute any kind of omission or failure to disclose, Defendants had and have a duty to disclose such material information related to the cost of financing because, among other circumstances detailed in the general allegations above:

- Defendants and their partner Minnesota solar companies have special if not exclusive knowledge concerning the upfront fees charged by Defendants and added to the stated price of systems offered for purchase;

- Defendants and their partner Minnesota solar companies have special knowledge that consumers may be able to purchase systems for cash prices that do not include the upfront fees and that can be financed by other lenders that do not impose such upfront fees;

- Minnesota solar companies that partner with Defendants offer and describe themselves to consumers as consultants and experts in identifying options for paying for or financing purchases from consumers;

- Minnesota laws (as referenced in paragraph 239) create a duty and expectation to accurately and prominently disclose the finance charge and annual percentage rate; and

- Disclosure is required to correct the misleading representations and impression from Defendants and the Minnesota solar companies that (a) the stated price for financed systems is for hardware and installation, not financing and (b) the APR stated in sales proposals (and also loan documents) represents the actual cost of financing.

242.    Defendants' misrepresentations have caused harm to Minnesota consumers such that consumer restitution and/or disgorgement is an appropriate remedy. This includes refunds for loan repayments and debt relief from loan balances attributed to hidden fees. As detailed in the general allegations above, Defendants have collected an estimated $35 million in hidden fees from Minnesota consumers since 2017, inflating the cost of nearly 5,500 systems at the expense of consumers who may never have taken out a loan from Defendants if they would had been informed of the true cost of financing. Defendants' practice has skewed sales towards their financing, prevented comparison shopping, and given Defendants and their partners an inflated share of the market at the expense of lenders and businesses that obey the law.

243. Additionally, and as detailed in paragraphs 126 through 129 and 170 through 175, Defendants Sunlight Financial and Solar Mosaic further engaged in misrepresentation by making statements that loan repayment obligations are independent of misrepresentations and failures of performance caused by the Minnesota solar company that partnered with Sunlight Financial and Solar Mosaic and sold the system. These misrepresentations were intended to induce Minnesota consumers to rely on them and believe they had no defense to repayment, when in fact the Holder Rule—adopted and incorporated by the Minnesota Uniform Commercial Credit Code, Minn. Stat. § 336.3-305(e)—provides for a defense to repayment on the loans based on any defenses that could be asserted against the seller. These misrepresentations were also unfair in that they offend and undermine public policy, are unethical, oppressive, or unscrupulous, and/or substantially injure consumers who are affected and deterred from asserting their rights.

244. Defendants' conduct, practices, actions, and material omissions described in this Complaint constitute multiple, separate violations of Minn. Stat. §§ 325D.43-.48.

## COUNT III
### (ALL DEFENDANTS)
### FALSE STATEMENT IN ADVERTISING ACT
### MINN. STAT. § 325F.67

245. The State incorporates by reference paragraphs 1 through 224 of this Complaint.

246. Minn. Stat. § 325F.67 (the False Statement in Advertising Act or "FSAA") states that "any person [or] corporation" who has "intent to sell … [a] service[] or anything offered by such person … to the public … for sale … or to induce the public in any manner to enter into any obligation relating thereto" and "makes, publishes, disseminates, circulates, or places before the public .. in this state" and "in a … publication, … letter, … or in any other way, an advertisement of any sort regarding [the] service … for use, consumption, purchase, or sale" is liable if the

"advertisement contains any material assertion, representation, or statement of fact which is untrue, deceptive, or misleading."

247.    Defendants' loans are "merchandise [or a] service, or anything offered … directly or indirectly, to the public" within the meaning of the statute. Defendants are "persons" or "corporations" within the meaning of the statute.

248.    Defendants, both through their communications to consumers and through their sales partners authorized and directed to market and sell their loans, have repeatedly violated and continue to violate the FSAA by engaging in the deceptive and misleading practices described in this Complaint, which include but are not limited to the following summarized practices:

- Using sales proposals and verbal marketing to consumers that purport to identify costs of taking out a loan but failing to identify Defendants' upfront fees or include them in purported calculation of such costs,

- Failing to disclose or identify the fact that Defendants charge large upfront fees as a condition of extending credit and the amount of such fees,

- Preventing Minnesota solar companies from otherwise identifying or explaining Defendants' upfront fees to consumers and from discussing less-costly "cash" purchase options;

- Using sales proposals to consumers that falsely identify a purported price to be paid for parts and installation related to the solar-panel system when in fact a large portion of the stated price and resulting principal balance is paid to/retained by Defendants rather than disbursed to purchase the system;

- Providing loan documents to consumers that state an annual percentage rate and finance charge that does not include Defendants' upfront fees in the calculation and is inaccurately low;

- Providing loan documents with an "itemization of amount financed" that falsely represents that the principal loan balance will be paid to the Minnesota solar sales company when in fact a large portion of the stated price and resulting principal balance is paid to/retained by Defendants rather than disbursed to purchase the system;

- Providing other documents to consumers and otherwise expressing that the price listed in purchase agreements for the solar-panel system sold is for parts and installation and that the principal loan balance will be paid to the Minnesota solar sales company when

in fact a large portion of the stated price and resulting principal balance is paid to/retained by Defendants rather than disbursed to purchase the system;

-   To the extent Defendants GoodLeap and Solar Mosaic include fine-print disclaimers concerning the potential for additional costs included in the purchase price, falsely communicating that they do not know whether the upfront fee was charged, failing to identify the significant amount of the fee, and including the disclaimer after the customer has agreed to make the purchase and received a stated APR in sales proposals and loan documents that does not include the upfront fee in the calculation of financing costs.

Each of the above practices (a) provide individual and independent bases for injunctive and other relief and (b) together create a false net impression for Defendants' borrowers that the principal balance of their loan pays for parts and installation of the solar-panel system and that the cost of Defendants' loans is negligible and reflective only of the annual interest rate charged after origination and repayment begins.

249.   The above deceptive practices were and are undertaken by Defendants with the intent to sell Defendants' loans. As described above, the cost of financing is an obvious material term for consumers in determining whether to (a) purchase a system, (b) take out a loan to finance the purchase, and (c) finance from a particular company at a particular rate. Misstating and hiding the cost of financing as described above is intended to induce more consumers to purchase from Defendants' partner Minnesota solar companies and finance those purchase via Defendants' loans.

250.   The misleading practices above concern affirmative communications to consumers concerning the price of systems and cost of Defendants' financing and tend to create a false net impression for consumers concerning those material aspects of sales. But to the extent such conduct is in any respect deemed to constitute any kind of omission or failure to disclose, Defendants had and have a duty to disclose such material information related to the cost of financing because, among other circumstances detailed in the general allegations above:

- Defendants and their partner Minnesota solar companies have special if not exclusive knowledge concerning the upfront fees charged by Defendants and added to the stated price of systems offered for purchase;

- Defendants and their partner Minnesota solar companies have special knowledge that consumers may be able to purchase systems for cash prices that do not include the upfront fees and that can be financed by other lenders that do not impose such upfront fees;

- Minnesota laws (as referenced in paragraph 239) create a duty and expectation to accurately and prominently disclose the finance charge and annual percentage rate;

- Minnesota solar companies that partner with Defendants offer and describe themselves to consumers as consultants and experts in identifying options for paying for or financing purchases from consumers; and

- Disclosure is required to correct the misleading representations and impression from Defendants and the Minnesota solar companies that (a) the stated price for financed systems is for hardware and installation, not financing and (b) the APR stated in sales proposals (and also loan documents) represents the actual cost of financing.

251.    Defendants' misrepresentations have caused harm to Minnesota consumers such that consumer restitution and/or disgorgement is an appropriate remedy. This includes refunds for loan repayments and debt relief from loan balances attributed to hidden fees. As detailed in the general allegations above, Defendants have collected an estimated $35 million in hidden fees from Minnesota consumers since 2017, inflating the cost of nearly 5,500 systems at the expense of consumers who may never have taken out a loan from Defendants if they would had been informed of the true cost of financing. Defendants' practice has skewed sales towards their financing, prevented comparison shopping, and given Defendants and their partners an inflated share of the market at the expense of lenders and businesses that obey the law.

252.    Defendants' conduct, practices, actions, and material omissions described in this Complaint constitute multiple, separate violations of Minn. Stat. § 325F.67.

**COUNT IV**
**(DEFENDANTS GOODLEAP, SUNLIGHT FINANCIAL, AND SOLAR MOSAIC)**
**DECEPTIVE LENDING**
**MINN. STAT. CH. 56**

253.     The State incorporates by reference paragraphs 1 through 224 of this Complaint.

254.     Chapter 56 of the Minnesota Statutes, titled the Minnesota Regulated Loan Act, regulates "the business of making loans" up to $100,000 and applies to all such lenders not otherwise regulated or supervised as banks, credit unions, and industrial loan and thrifts.

255.     Defendant GoodLeap has been a licensee under chapter 56 since 2018. Defendant Sunlight Financial has been a licensee under chapter 56 since 2021. Defendant Solar Mosaic has been a licensee under chapter 56 since March 2023.

256.     Chapter 56 includes three alternative provisions concerning misrepresentations and omissions by lenders when marketing and signing up consumers for loans. First, section 56.12 broadly prohibits misleading or deceptive conduct as to loan terms, providing that "[n]o licensee shall advertise, print, display, publish, distribute, or broadcast, or cause or permit to be advertised, printed, displayed, published, distributed, or broadcast, in any manner any statement or representation with regard to the rates, terms, or conditions for the lending of money, credit, goods, or things in action which is false, misleading, or deceptive." Second, section 56.12 provides that the Department of Commerce may enact affirmative disclosure obligations for licensees to "state[] fully and clearly" their "rates of charge" as "necessary to prevent misunderstanding thereof by prospective borrowers." In lieu of such rules, however, the section provides that licensees must "give the disclosures required by the federal Truth-in-Lending Act."[10] Because the Commissioner

---

[10] The "federal Truth in Lending Act" or "TILA" as identified in the statute refers to 15 U.S.C. § 1601 *et seq.*, enacted in 1968 as title I of the Consumer Credit Protection Act (Pub. L. 90-321) and implemented by the Consumer Financial Protection Bureau under Regulation Z, 12 C.F.R. 1026. TILA creates a "strict liability" duty under federal law for prominent disclosure of certain

has not adopted rules specifying disclosures, section 56.12 requires licensees to "give the disclosures required by [TILA]." Third, section 56.14(1) sets minimum licensee duties and provides that "every licensee shall … (1) deliver to the borrower … at the time any loan is made a statement making the disclosures and furnishing the information required by the federal Truth-in-Lending Act, United States Code, title 15, sections 1601 to 1667e, as amended from time to time, with respect to the contract of loan." Alternatively, Minn. Stat. § 47.59, subdivision 12, also requires Defendants as "financial institutions" to make disclosures as required under TILA.

257.    While they were licensees, Defendants GoodLeap, Sunlight Financial, and Solar Mosaic each have repeatedly violated and continue to violate section 56.12's prohibitions on deceptive lending practices by engaging in the deceptive and misleading practices described in this Complaint, which include but are not limited to the following summarized practices:

- Using sales proposals and verbal marketing to consumers that purport to identify costs of taking out a loan but failing to identify Defendants' upfront fees or include them in purported calculation of such costs,

- Failing to disclose or identify the fact that Defendants charge large upfront fees as a condition of extending credit and the amount of such fees,

- Preventing Minnesota solar companies from otherwise identifying or explaining Defendants' upfront fees to consumers and from discussing less-costly "cash" purchase options;

- Using sales proposals to consumers that falsely identify a purported price to be paid for parts and installation related to the solar-panel system when in fact a large portion of the stated price and resulting principal balance is paid to/retained by Defendants rather than disbursed to purchase the system;

---

defined credit terms before the transaction, with an "overriding purpose" to "protect[] unsophisticated consumers." *Wise Furniture v. Dehning*, 343 N.W.2d 26, 28 (Minn. 1984). TILA provides, however, that states may continue to impose their own disclosure duties unless such a law "requires the use of the same term to present a different amount or a different meaning than under Federal law, or if it requires the use of a term different from that required in the Federal law to describe the same item." 12 C.F.R. § 1026.28(a); 15 U.S.C. § 1610(a).

- Providing loan documents to consumers that state an annual percentage rate and finance charge that does not include Defendants' upfront fees in the calculation and is inaccurately low;

- Providing loan documents with an "itemization of amount financed" that falsely represents that the principal loan balance will be paid to the Minnesota solar sales company when in fact a large portion of the stated price and resulting principal balance is paid to/retained by Defendants rather than disbursed to purchase the system;

- Providing other documents to consumers and otherwise expressing that the price listed in purchase agreements for the solar-panel system sold is for parts and installation and that the principal loan balance will be paid to the Minnesota solar sales company when in fact a large portion of the stated price and resulting principal balance is paid to/retained by Defendants rather than disbursed to purchase the system;

- To the extent Defendants GoodLeap and Solar Mosaic include fine-print disclaimers concerning the potential for additional costs included in the purchase price, falsely communicating that they do not know whether the upfront fee was charged, failing to identify the significant amount of the fee, and including the disclaimer after the customer has agreed to make the purchase and received a stated APR in sales proposals and loan documents that does not include the upfront fee in the calculation of financing costs.

Each of the above practices (a) provide individual and independent bases for injunctive and other relief and (b) together create a false net impression for Defendants' borrowers that the principal balance of their loan pays for parts and installation of the solar-panel system and that the cost of Defendants' loans is negligible and reflective only of the annual interest rate charged after origination and repayment begins.

258.    Defendants GoodLeap, Sunlight Financial, and Solar Mosaic each have repeatedly violated and continue to violate sections 56.12 and 56.14(1) (and alternatively section 47.59), by failing to include their upfront fees in the "finance charge" and "annual percentage rate" identified in loan documents, which must be accurately displayed as "material disclosures" before consumers execute a loan under TILA and its implementing rule Regulation Z, 15 U.S.C. §§ 1601-1667f; 12 C.F.R. part 1026. Defendants' violations include but are not limited to the following summarized practices:

a. Defendants' upfront fees are a "finance charge" as defined under 15 U.S.C. § 1605 and 12 C.F.R. § 1026.18 that must be identified as such and included in the annual-percentage-rate figure prominently disclosed to consumers.

b. Specifically, Regulation Z defines a finance charge as "the cost of consumer credit as a dollar amount" and includes "any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit"; it does not include "any charge of a type payable in a comparable cash transaction." 12 C.F.R. § 1026.4(a). Regulation Z gives a non-exhaustive list of finance charges that align with Defendants' fees, including "service … charges" under 12 C.F.R. § 1026(b)(2), "points, loan fees, …[or] similar charges" under 12 C.F.R. § 1026.4(b)(3), and/or "charges imposed on a creditor by another person for … accepting a consumer's obligation, if the consumer is required to pay the charges … as a deduction from the proceeds of the obligation" under 12 C.F.R. § 1026(6). Moreover, Defendants' upfront fees are not a "charge of a type payable in a comparable cash transaction" because cash customers of Defendants' partner Minnesota solar companies do not pay Defendants' upfront fees.

c. Defendants' upfront fees, added to the stated price of every financed system and the original principal of every consumer's loan, are also a "prepaid finance charge," defined as "any finance charge … withheld from the proceeds of the credit." 12 C.F.R. § 1026.2(a)(23). Such prepaid finance charges, which must be disclosed as a finance charge and included in the APR calculation, must also "be taken into account under [12 C.F.R.] § 1026.18(b) in computing the disclosed amount financed[] and must be disclosed if the creditor provides an itemization of the amount financed under [12 C.F.R.] § 1026.18(c)." *Id*. In other words, consumers should know if they are financing upfront loan fees or points before they decide to take out the loan that includes such fees. Defendants thus further violate TILA by displaying an "itemization" of the "amount financed" that does not itemize or identify the amount of the financed upfront fee. Instead, the itemization in Defendants' disclosures falsely tell consumers that the entirety of the amount financed (i.e., the loan's principal) is paid to the Minnesota solar company for the solar-panel system.

d. Defendants' arguments that their upfront fees are not "finance charges" rely on contractual fictions that are contradicted by facts and the practical realities of their relationships and the actual sales of solar-panel systems by their partner solar companies. Contrary to Defendants' evasions, the upfront fees are not in reality "costs of doing business" incurred and paid by partner solar companies and absorbed into an across-the-board or standard price. Rather, they are fees imposed directly by Defendants as lenders as a condition of extending credit, are paid by the borrowers and not solar companies, and are *not* imposed on cash sales of same or similar systems. As directed by Defendants, the fees are added to the price, included in the stated cost of financed systems and thus the original

balance of each loan, and paid by the borrower—either directly or indirectly. The consumer is legally bound to pay the upfront fees to Defendants, which pay for the Defendants' so-called services in making the loan and/or are "points" that the consumer must pay in exchange for a lower interest rate, albeit unknown to the consumer.

259.    Additionally, Defendants Sunlight Financial and Solar Mosaic further engaged in misrepresentation in violation of section 56.12's general prohibition by making statements as licensees that loan repayment obligations are independent of misrepresentations and failures of performance caused by the Minnesota solar company that partnered with those lenders and sold the system. These misrepresentations were intended to induce Minnesota consumers to rely on them and believe they had no defense to repayment, when in fact the Holder Rule—adopted and incorporated by the Minnesota Uniform Commercial Credit Code, Minn. Stat. § 336.3-305(e)— provides for a defense to repayment on the loans based on any defenses that could be asserted against the seller.

260.    Defendants' conduct, practices, actions, and material omissions described in this Complaint constitute multiple, separate violations of the Regulated Loan Act, Minn. Stat. ch. 56.

**COUNT V**
**(DEFENDANTS GOODLEAP AND SOLAR MOSAIC)**
**USURY FOR LENDING BUSINESSES**
**MINN. STAT. §§ 56.01, 56.131, SUBD. 1(A), 56.18, & 47.59**

261.    The State incorporates by reference paragraphs 1 through 224 of this Complaint.

262.    Section 56.131, subdivision 1(a) of the Minnesota Regulated Loan Act restrains licensees by providing that they may only contract for and receive the "interest, finance charges, and other charges as provided in section 47.59 [the Minnesota Consumer Credit Code]." Defendants GoodLeap and Solar Mosaic are licensees subject to chapter 56. Defendants GoodLeap and Solar Mosaic are also "financial institutions" under section 47.59, subdivision 1(k).

263.    Subdivision 3 of section 47.59 sets the following limits on the amount that a financial institution can "contract for and receive" as a "finance charge" on the unpaid principal balance of a loan's principal amount: (a) an annual percentage rate not exceeding 21.75% for the total loan amount or (b) an annual percentage rate of 33% on the first $1,350 of the unpaid balance of the principal amount and 19% on the remainder of the unpaid balance of the principal amount. Subdivision 3(f) of section 47.59 further provides that, if a finance charge is "included in the principal amount of the loan" and "the borrower prepays the loan in full," the lender must "credit the borrower with a refund of the charge to the extent the [APR] yield on the loan would exceed the [allowable APR] on the loan as originally determined under [section 47.59, subdivision 3(a)] and taking into account the prepayment." In other words, when finance charges are included in the principal balance of a loan and the consumer pays off the loan early, the annualized rate must be recalculated based on the shortened term, and finance charges exceeding legal limits must be refunded by the lender.

264.    Defendant GoodLeap collected finance charges on prepaid loans that exceed allowable rates under subdivision 3 of section 47.59. For GoodLeap, the average finance charge exceeding the allowable amount for the 88 borrowers that are known to have prepaid their loans is $3,417.14. GoodLeap has not refunded these borrowers for finance charges collected that exceed allowable rates.

265.    Defendant Solar Mosaic collected finance charges on prepaid loans that exceed allowable rates under subdivision 3 of section 47.59. For Solar Mosaic, at least 128 borrowers paid their loans off early resulting in adjustments to their effective APRs to between 21.76 and 459.94% and exceeding allowable annualized rates under Minnesota law, requiring refunds. The average

finance charge exceeding the allowable amount for these 128 borrowers was $2,445.56. Solar Mosaic has not refunded these borrowers for finance charges collected that exceed allowable rates.

266.　Additionally, 2 loans originated by Defendant Solar Mosaic before it was a licensee and that charged rates above 8% annual interest violated section 56.01 (providing that "no person shall in engage in the business of making loans" with an initial balance of less than $100,000 and "charge, contract for, or receive" interest that is more than what is allowed if the person was not a "licensee under this chapter") and section 56.18 (providing that no person may charge or receive "any interest, discount, or consideration greater than the lender would be permitted by law to charge if that person were not authorized hereunder upon the loan"). Such loans subject to received interest and finance charges above the rates allowed under chapter 56 and section 47.59 are void and uncollectible pursuant to section 56.19 (providing that qualifying unlicensed loans are "void and the debtor is not obligated to pay any amounts owing"). Such loans are also void by operation of Minnesota's general usury statute, Minn. Stat. § 334.03 and § 334.05.

267.　Defendant GoodLeap and Defendant Solar Mosaic's conduct, practices, and actions described in this Complaint constitute multiple, separate violations of Minn. Stat. §§ 56.01, 56.131, subdivision 1(a), 56.18, and 47.59.

## PRAYER FOR RELIEF

The State respectfully asks this Court to award judgment against Defendants as follows:

1.　Declaring that Defendants' deceptive and misleading acts, practices, representations, and omissions described herein constitute multiple, separate violations of Minnesota law as provided in counts I through V above;

2.　Enjoining Defendants and their employees, officers, directors, agents, successors, assignees, affiliates, merged or acquired predecessors, parents or controlling entities, subsidiaries,

and all other persons acting in concert or participation with them, from engaging in the unlawful acts and practices described herein, including crafting preventative and reparative injunctive relief that cancels proportionate loan balances or otherwise stops collection of finance charges or loan amounts that should have but were not disclosed along with all other injunctive relief necessary to prevent and restrain both new violations and ongoing harm related to past violations;

3.    Awarding declaratory and injunctive relief, restitution, disgorgement, or any other consumer relief under the applicable statutes, common law *parens patriae* authority, section 8.31, as well as the general equitable powers of this Court and any other authority, for all persons injured by Defendants' violations as described in this Complaint, including allowing for rescission of loans and/or ordering Defendants to identify and refund all amounts paid by consumers on finance charges or loan amounts that should have but were not disclosed;

4.    Awarding judgment against Defendants for civil penalties pursuant to Minn. Stat. § 8.31 for each separate violation of Minnesota law and as necessary to effectively enforce applicable statutes and deter violations by Defendants and other parties;

5.    Declaring loans of Defendants GoodLeap and Mosaic in violation of the above-described usury and loan-licensing statutes void and/or ordering civil penalties under section 48.196, refunds related to unlicensed loans under section 56.19, subd. 3, and/or refunds for excessive finance charges collected on prepaid loans under section 47.59, subd. 3(f);

6.    Awarding the State its costs, including costs of investigation and attorneys' fees, as authorized by Minnesota Statutes section 8.31, subdivision 3a; and

7.    Granting such further relief as provided by law or as the Court deems appropriate and just.

Dated: November 14, 2024                    Respectfully submitted,

                                            KEITH ELLISON
                                            Attorney General
                                            State of Minnesota

                                            JESSICA WHITNEY
                                            Deputy Attorney General

                                            JASON PLEGGENKUHLE
                                            Assistant Attorney General
                                            Atty. Reg. No. 0391772

                                            */s/ Adam Welle*
                                            ADAM WELLE
                                            Assistant Attorney General
                                            Atty. Reg. No. 0389951
                                            adam.welle@ag.state.mn.us

                                            NOAH LEWELLEN
                                            Assistant Attorney General
                                            Atty. Reg. No. 0397556

                                            445 Minnesota Street, Suite 1200
                                            St. Paul, Minnesota 55101-2130
                                            (651) 757-1425

                                            *Attorneys for the State of Minnesota*